[No. 30356-6-II. Division Two. January 4, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. HEIDI CHARLENE FERO, *Appellant*.

*John A. Hays*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Thomas C. Duffy, Deputy*, for respondent.

¶1 Bridgewater, J. — Heidi Fero appeals her conviction and sentence for first degree assault of a 15-month-old child she babysat. We hold that there was sufficient evidence to support the verdict because the injuries were consistent with "shaken baby syndrome" caused by nonaccidental, repetitive force that a four and one-half year old child (the perpetrator identified by Fero) could not cause. We also hold that the to-convict instruction was proper; it was consistent with the statute when it required "intentionally assaulted" and "recklessly inflicted great bodily harm," and required a causal connection between the assault and the injury without using the word "thereby." We also hold that the trial court erred when it imposed an exceptional sentence because the jury did not find either that the victim was "particularly vulnerable" or that Fero "breached her duty to protect" the child in violation of *Blakely v. Washington*, __ U.S. __, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). 2 Clerk's Papers (CP) at 188. Finally, regardless of the facts that Fero was a baby-sitter and the child was 15 months old, the "harmless error" doctrine does not apply under *Blakely*. We affirm the conviction, but remand for resentencing consistent with *Blakely*.

## I. The Injury

¶2 Around 10:00 P.M. on January 7, 2002, paramedics responded to the 3100 block of Falk Road in Clark County, Washington. Blain Dohman, the lead paramedic for American Medical Response, was met at the door by Heidi Fero. Fifteen-month-old Brynn Ackley was unconscious, flaccid, and pale. Dohman noted Brynn had bruising on her forehead, around her nose, and on her chin.

¶3 The paramedics took Brynn to Southwest Washington Medical Center (SWWMC). They also called the police

to respond to the scene. At the SWWMC, a doctor determined that Brynn was too sick to be treated at the hospital and had her transferred to Legacy Emmanuel Hospital in Portland, Oregon.

¶4 At Legacy Emmanuel, a neurologist performed emergency surgery on Brynn to remove a blood clot from her brain and to remove a large flap of bone to provide room for brain swelling. Brynn's total injuries were a subdural hematoma; bilateral hemorrhages; a laceration on the inside of her labia; large bruises on her cheeks, chin, chest, the area above her vagina, and on the labia majora; and an oblique fracture of her left tibia.

¶5 On June 12, 2002, the State charged Fero with one count of first degree assault of a child.

## II. The Trial

¶6 At trial, the State called several witnesses to prove causation and to refute the defense's theory that Kaed, Brynn's four and one-half year old half brother, caused her injuries. The lead paramedic testified that upon arriving at Fero's place, he noticed the bruising to Brynn's face and asked Fero whether the bruises were new or old. The only information Fero gave him was that Brynn had suffered some bruises from recent attacks by her older brother, Kaed. Fero also did not tell Dohman that Brynn had a limp or had trouble walking. Dohman further testified that the bruising on Brynn's face progressed rapidly from the time he and his partner arrived until they reached the hospital.

¶7 Jeff Tone, Dohman's partner the night of the injury, testified that he noticed upon arriving that Brynn was "limp, like a rag doll" and did not look "very alive." 1 Report of Proceedings (RP) (Mar. 11, 2003) at 39. He stated that Fero was hyper, asked the paramedics multiple questions, and kept repeating herself by saying, "Did I do the right thing?" 1 RP (Mar. 11, 2003) at 39. Fero explained to Tone that Brynn was hurt when Kaed swung her into the wall "like a baseball bat." 1 RP (Mar. 11, 2003) at 40. Fero told

Tone she did not actually see the attack but her daughter told her what had happened.

¶8 Officer Scott Telford of the Vancouver Police Department investigated the incident. Officer Telford testified that Fero told him she was upstairs when Brynn was hurt. She came downstairs to check on the children and everything was fine. Fero went back upstairs and when she returned less than five minutes later, she saw Kaed jumping out of Brynn's play crib. She told Officer Telford that Brynn was crying and had some blood coming out of her mouth. Officer Telford checked the play crib and found no blood in it.

¶9 Officer Telford further testified that Fero told him that she held Brynn until she stopped crying and then put her on the couch. When she went back to check on her about five minutes later, Brynn's eyes were glazed over, she was unresponsive, and not breathing. Fero told Officer Telford she then called 911.

¶10 Fero also provided a written statement to Officer Telford. In her statement, Fero wrote that Kaed hit his sister with a toy hammer, hitting her in the face, and that he jumped on top of her. She also wrote that when she picked up Brynn, she was okay. She had some blood coming out of her mouth but she was crying and being normal. Fero wrote that she checked on Brynn a few minutes later and found that she was unresponsive. The State also played the 911 dispatch tape. The tape recorded Fero stating that she laid Brynn down and shortly after doing so, checked on the little girl and found her unresponsive.

¶11 The State also called Detective Scott Smith of the Vancouver Police Department. Detective Smith had videotaped Fero's apartment, focusing on the play crib. He also placed the green plastic toy hammer into evidence. He testified that Fero told him the play crib had originally been against the wall and then it was moved out from the wall. By looking underneath the play crib and by marks in the carpet, the detective confirmed that the play crib had not been moved.

¶12 Detective Smith took photos of the wall behind the play crib believing that if the play crib was against the wall during Brynn's injury that, presumably, the play crib made marks against the wall during the assault. The marks that the detective found on the wall did not correspond with the height of the play crib. Detective Smith further stated that while collecting evidence at the apartment, he overheard the defendant talking with her mother. Fero told her mother that she had shaken Brynn but only in order to wake her up.

¶13 Jason Ackley, Brynn's father, also testified. Ackley knew Dustin Goodwin, Fero's boyfriend, from work. He knew that Fero was unemployed and asked Goodwin if Fero could baby-sit Brynn and Kaed.

¶14 On the night of Brynn's injury, Ackley spoke with Fero twice; around 7:45 P.M. and 10:30 P.M. During the first call, Fero voiced her concerns about Kaed hurting Brynn and that Brynn was unable to walk on a leg. Fero told Ackley that her daughter saw Kaed push Brynn's head into a wall. Ackley did not remember Fero telling him about any bruises on Brynn.

¶15 Ackley stated that at 10:30 P.M., Goodwin called Fero but she could not talk because "something had happened." 1 RP (Mar. 11, 2003) at 121. Ackley then called Fero back and spoke with her. Fero told him that she laid Brynn down for a nap after giving her a bath. When she returned to check on her, Brynn was not breathing.

¶16 Ackley testified that Kaed was occasionally rough with Brynn but that Brynn had never sustained any injuries from Kaed. Ackley also saw Brynn before she went to Fero's house on January 7, and she was walking fine, was running around, and did not have any bruises on her face.

¶17 The State also called Breanne Franck, Brynn's mother. Franck testified that Kaed was only four and one-half years old at the time of Brynn's injury. Franck dropped the children off at Fero's around 2 P.M. on January 7. Brynn had neither bruises nor any trouble walking before being left with Fero. Franck also testified that Kaed had never injured Brynn.

¶18 Detective Steve Norton of the Child Abuse Intervention Center investigated the case. He testified that Fero told him she was upstairs giving her son a bath when her daughter came to tell her that Kaed had hurt Brynn. Fero went downstairs and everything was fine. She then went back upstairs, dried off her son, and came back downstairs where she saw Kaed jumping out of the play crib.

¶19 Fero told Detective Norton that Brynn was in the play crib on "all fours facing the wall" and that there was some blood coming out of her mouth. 2 RP (Mar. 12, 2003) at 191. She put Brynn on the couch and Brynn appeared to "go to sleep." 2 RP (Mar. 12, 2003) at 192. Fero told the detective that when she brushed Brynn's hair away from her eyes, her head rolled to one side and she did not look like she was breathing. Fero picked up Brynn and tried to "revive" her by smacking her face and splashing water on her. 2 RP (Mar. 12, 2003) at 192. She then called her mother and then called 911. Fero told Detective Norton that five minutes elapsed from when she took Brynn out of the play crib, put her on the couch, and then noticed something was wrong.

¶20 Detective Norton stated that Fero told him that her daughter told her that Kaed hit Brynn with the little green toy hammer. The detective asked Fero about prior injuries to Brynn. Fero told him that Brynn had "some red marks" on her stomach but she did not tell the detective that Brynn had any problems walking or even had a limp. 2 RP (Mar. 12, 2003) at 193.

¶21 The detective also asked Fero if she gave Brynn a bath that evening. Fero denied giving Brynn a bath and told the detective that Brynn had not been upstairs all evening. She also denied changing Brynn's diaper that night. Detective Norton also questioned Fero about other causes for Brynn's injuries. Fero told him that her daughter "may" have seen Kaed hitting Brynn's head into the wall, and that Kaed had jumped on his sister. 2 RP (Mar. 12, 2003) at 196.

¶22 The State introduced letters written on Fero's behalf by attorney Jerry Wear, Fero's first attorney. In one letter, Fero indicated that Brynn had a limp when she arrived at the apartment and that she had bruises on her chin and abdomen. Fero never told this information to Detective Norton.

¶23 The State presented the testimony of several doctors who had treated Brynn after her injury. Dr. Daniel Gorecki, an emergency room physician at SWWMC, treated Brynn before her transport to Legacy Emmanuel Hospital. A CAT (computerized axial tomography) scan of Brynn's brain showed a severe brain injury caused by a blood clot on her brain, bleeding in the brain, and brain swell, which caused the brain to "shift[ ]." 1 RP (Mar. 12, 2003) at 60. Dr. Gorecki further testified that Brynn's injuries were not caused by a four and one-half year old little boy. He stated that Brynn's injuries were caused by "repetitive force" and a child is not capable of causing repetitive injuries. 1 RP (Mar. 12, 2003) at 64.

¶24 Dr. James Ockner, a radiologist from SWWMC, also testified. Dr. Ockner stated that Brynn suffered "a collection of blood that . . . clotted" between the brain and the skull on the left side of her brain. 1 RP (Mar. 12, 2003) at 83. He informed the jury that when the brain is shaken, the veins in the brain break and start to bleed, and a collection of blood forms in what is called a "subdural hematoma." 1 RP (Mar. 12, 2003) at 84. The doctor further stated that the injury that caused the subdural hematoma was quite severe because it caused the brain to swell. Dr. Ockner found no evidence of a big blow to Brynn's head, such as a lump on the side of the head or a goose egg where the blow had occurred. Since there was no evidence of impact to Brynn's skull, the doctor testified it was a "shaking injury" that caused the damage to Brynn's brain. 1 RP (Mar. 12, 2003) at 91. He concluded that someone inflicted Brynn's injury and that it was not an accident.

¶25 Dr. Mike Lukschu, a pediatrician at Legacy Emmanuel, examined Brynn on January 8, 2002. He testified that he was familiar with the medical diagnosis of

"shaken baby syndrome" (SBS) and the symptoms associated with it. 2 RP (Mar. 11, 2003) at 179. He stated that SBS is an inflicted injury and not accidental. He also noted that Brynn's head injury was so severe that she would have gone unconscious immediately. It was his opinion, based on the multiplicity of bruises and their location, that someone inflicted the bruises. Dr. Lukschu further testified that he had seen bilateral retinal hemorrhages only in patients who had suffered SBS. The doctor stated that a four and one-half year old could not cause bilateral retinal hemorrhages because a four and one-half year old could not inflict the kind of force necessary to cause the hemorrhages.

¶26 The State also called Dr. Shawn Goodman, a pediatric ophthalmologist. Dr. Goodman was called to Legacy Emmanuel on consult to evaluate the injury to Brynn's eyes. She testified that Brynn suffered hemorrhages in both eyes over the surface of the retina and within the retina. Dr. Goodman stated that the bilateral retinal hemorrhages were "consistent with nonaccidental trauma." RP (Mar. 13, 2003) at 63.

¶27 Dr. William Gerald Bennett, a pediatric radiologist at Legacy Emmanuel, testified about the fracture of Brynn's left leg. On the x-ray depicting Brynn's legs, the doctor identified a fracture through the midpart of the left tibia. Dr. Bennett explained that the characteristics of Brynn's fractured tibia showed that it was a recent fracture, that it was an "oblique" or "spiral" fracture, and that the fracture was "displaced" or "pulled apart." RP (Mar. 13, 2003) at 14, 16.

¶28 The doctor stated that a child suffering this type of fracture would not walk on the leg because it would be too painful. He further explained that to cause a displaced spiral fracture, a person would have to "twist the leg violently." RP (Mar. 13, 2003) at 16. He noted that it would take a lot of force to produce this type of fracture and that a four and one-half year old boy is not strong enough to cause this type of fracture.

¶29 Dr. Kent M. Grewe, a neurosurgeon, also testified at trial. He explained that there would not be any lucid interval of time between Brynn sustaining the brain injury and the onset of the brain swelling. The doctor further stated that if a blow to the head had caused Brynn's brain injury, there would have been a fracture of her skull because the brain injury was so severe. Brynn did not have a skull fracture. Dr. Grewe also stated that a boy Kaed's size could not produce such a brain injury by hitting her in the head with a green plastic toy hammer or by pushing her head into the wall.

¶30 Fero also testified. She explained that the injury occurred around 7 P.M., after she finished giving Brynn a bath. After Brynn's bath, she dressed the little girl and put her to bed in the play crib downstairs. She then took her son upstairs to the master bathroom to give him his bath. The layout of Fero's apartment did not allow her to see what was happening downstairs while she was upstairs. While giving her son a bath, Fero's daughter came upstairs to tell her that Kaed was hurting Brynn. She testified that as she went down the stairs, she saw Kaed attempting to get out of the play crib. Brynn was on her hands and knees in the play crib and she had a little bit of blood in her mouth. Fero held Brynn and comforted her. Thinking Brynn was asleep, she laid the little girl down on the couch. It was not until 9:45 that evening that Fero noticed Brynn was unresponsive and called 911. Fero stated that she never actually saw Kaed attack Brynn. She also explained that she was not good in emergency situations.

¶31 At the close of evidence, the trial court read the jury instructions to the jury. The jury instructions included, jury instruction 7, the "to-convict" instruction. 1 CP at 98. Fero did not object to the instruction.

¶32 After hearing closing arguments, the jury deliberated and returned a verdict of guilty. Fero's standard range sentence was 93 to 123 months. The court later imposed an exceptional sentence of 180 months. The court found that Brynn was particularly vulnerable because of extreme

youth, and that Fero had acted in breach of an affirmative duty to protect Brynn.

## III. Sufficient Evidence

¶33 Fero argues there was insufficient evidence to support her conviction. We review a challenge of insufficient evidence in the light most favorable to the State to determine "whether . . . any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)). The court may infer criminal intent from conduct. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201 (citing *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201 (citing *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980)). The reviewing court considers circumstantial evidence equally reliable as direct evidence. *State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

¶34 The State offered the testimony of several doctors who had all treated Brynn after her injury. Their testimony portrayed the injuries as nonaccidental, consistent with the "shaken baby syndrome," and impossible for a four and one-half year old to have caused the repetitive injury to the brain or the spiral fracture of the leg. None of the doctors found that her four and one-half year old brother could have inflicted the serious injuries that Brynn sustained. Moreover, Brynn's parents testified that Brynn had no recent bruises nor was she

limping at the time they left her with Fero. Additionally, as demonstrated above, Fero's own testimony and statement to others was conflicting.

¶35 Taking the evidence in the light most favorable to the State, and leaving credibility determinations to the jury, sufficient evidence existed to support Fero's conviction.

## IV. Jury Instruction

¶36 Fero next contends that the trial court failed to properly instruct the jury. But Fero did not object at trial to the court's instruction. Fero argues the court committed a manifest constitutional error and that she can raise this issue on appeal.

¶37 A defendant must timely and specifically object to the trial court's giving of an instruction or the refusal to give a requested instruction. *Reed v. Pennwalt Corp.*, 93 Wn.2d 5, 6, 604 P.2d 164 (1979). If the alleged error in the jury instruction is a manifest constitutional error, it may be reviewable unless an adequate exception applies. RAP 2.5(a). Where a jury instruction omits an element of the charged crime, an error of constitutional magnitude arises. *State v. Scott*, 110 Wn.2d 682, 688 n.5, 757 P.2d 492 (1988) (citing *State v. Johnson*, 100 Wn.2d 607, 623, 674 P.2d 145 (1983), *overruled on other grounds in State v. Bergeron*, 105 Wn.2d 1, 711 P.2d 1000 (1985)).

¶38 Jury instruction 7 contained the "to-convict" instruction.[1] Fero asserts that the instruction omitted a causal connection between the assault and the injury because the

---

[1] Jury instruction 7 read as follows:

To convict the defendant of the crime of assault of a child in the first degree, as charged in Count 1, each of the following elements must be proved beyond a reasonable doubt:

(1) That on or about the 7th day of January, 2002, the defendant intentionally assaulted Brynn M. Ackley (female, DOB: 9-30-00) and recklessly inflicted great bodily harm;

(2) That the defendant was eighteen years of age or older and Brynn M. Ackley was under the age of thirteen; and

(3) That the acts occurred in the State of Washington.

instruction does not contain the word "thereby." Br. of Appellant at 21. She contends that this was an error because the jury could have found that she assaulted Brynn but that it was actually Brynn's half-brother who caused her injuries. We disagree.

■ ■ ¶39 While it is true the instruction does not contain the "thereby" language, jury instructions are sufficient when they are not misleading, permit each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law. *State v. Edwards*, 84 Wn. App. 5, 14, 924 P.2d 397 (1996) (citing *Hyatt v. Sellen Constr. Co.*, 40 Wn. App. 893, 895, 700 P.2d 1164 (1985)), *review denied*, 131 Wn.2d 1016 (1997). Here, element one of jury instruction 7 instructed the jury that in order to find Fero guilty, it had to find that she intentionally assaulted Brynn and "recklessly inflicted great bodily harm." 1 CP at 98. The instruction contains the allegedly missing causal element and it is consistent with the statute. In fact, the instruction instructed the jury on every element of the crime that the State had to prove. The jury had to find that Fero both assaulted Brynn and that as a result of the assault, Fero recklessly inflicted great bodily harm. The jury could not have possibly misinterpreted the instruction and found that Fero assaulted Brynn but that the half-brother caused the injuries.

## V. *Blakely* Issue

¶40 RCW 9.94A.510 provides a standard range sentence of 93 to 123 months for first degree assault of a child. The State moved for a 216-month exceptional sentence. The trial court found aggravating factors and sentenced Fero to

---

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if after weighing all of the evidence, you have a reasonable doubt as to any of these elements, then it will be your duty to return a verdict of not guilty.

1 CP at 98.

180 months. The trial court erred when it imposed an exceptional sentence without first submitting the issue of aggravating factors to a jury.

¶41 In *Blakely*, the Supreme Court applied its ruling from *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and held that any fact a court uses to increase a penalty beyond the statutory maximum must first be submitted to a jury and *proved beyond a reasonable doubt*. *Blakely*, 124 S. Ct. at 2536.

¶42 Here, the trial court, not the jury, found the facts supporting an exceptional sentence based on the victim's vulnerability because of her young age and Fero's affirmative duty to protect the victim from harm because she was the victim's caregiver. The court did not submit either of these aggravating factors to a jury. Nor were they found beyond a reasonable doubt, which is the burden of proof necessary for the imposition of an exceptional sentence under *Blakely*. *Blakely*, 124 S. Ct. at 2536. In fact, the trial court's findings do not discuss the burden of proof it used to find the presence of the aggravating factors.

¶43 The situations discussed in *Blakely* that allow a court to impose an exceptional sentence without first submitting it to a jury, were not present in this case. First, Fero had no prior criminal history. A prior conviction allows a court to impose a sentence greater than the statutory maximum without first presenting it to the jury. *Blakely*, 124 S. Ct. at 2536. Second, the facts in the jury verdict do not reflect the facts the court used to impose the exceptional sentence. The verdict stated only that the jury found Fero guilty. It did not state any facts the jury used in reaching its verdict. A court may impose an exceptional sentence when it is based on facts reflected in the jury verdict. *Blakely*, 124 S. Ct. at 2537. Finally, a court may impose an exceptional sentence only where the defendant has admitted the facts the court used to impose the exceptional sentence. *Blakely*, 124 S. Ct. at 2537. Fero never admitted she had an affirmative duty to protect the victim because she was the victim's

caregiver. Nor did she admit that the victim was vulnerable because of her young age.

¶44 The State contends that the court's failure to submit aggravating factors to the jury was a harmless error under the holding in *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). In *Neder*, the Supreme Court adopted a harmless error analysis for use when the court fails to instruct the jury on all elements of an offense. *Neder*, 527 U.S. at 9. The Court found that such a failure "does not necessarily render a criminal trial fundamentally unfair." *Neder*, 527 U.S. at 9. But, the harmless error doctrine does not apply to structural errors; rather, structural errors are subject to automatic reversal. *Neder*, 527 U.S. at 8 (listing as examples: total denial of counsel, biased trial court, racial discrimination in selection of grand jury, denial of self-representation at trial, denial of public trial, and defective reasonable-doubt instruction). The court in *Neder* held that failing to instruct the jury does not result in automatic reversal because such error is not a "structural" error, i.e. " 'a defect affecting the framework within which the trial proceeds.' " *Neder*, 527 U.S. at 8 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). A defect that results in a structural error " 'infect[s] the entire trial process.' " *Neder*, 527 U.S. at 8 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). Instead, a court should conduct a harmless error analysis to see "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Neder*, 527 U.S. at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)).

¶45 The Court considered *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), in making its determination. In *Sullivan* the Court held that a defective reasonable doubt instruction was a "structural" error. *Sullivan*, 508 U.S. at 281. In *Neder*, the Court reiterated its holding from *Sullivan*, stating that "harmless-error analysis cannot be applied to a constitutional

error that precludes the jury from rendering a verdict of guilty-beyond-a-reasonable-doubt." *Neder*, 527 U.S. at 11. The Court distinguished the situation in *Neder* by holding that the incomplete jury instruction merely prevented the jury from making a finding on an element of the crime charged. *Neder*, 527 U.S. at 11. We find that *Neder* is inapplicable to violations of *Blakely*. Unlike *Neder* which dealt with flawed jury instructions, *Blakely* addressed a defendant's fundamental right to trial by jury.

¶46 The State asserts that under the *Neder* harmless error analysis, Fero need not be resentenced because overwhelming evidence supported the aggravating factors the court relied on. In its brief, the State cites several cases that have used the *Neder* harmless error analysis where a judge, rather than a jury, decided a fact for sentencing purposes. But the holdings in these cases do not overcome *Blakely*'s clear language. The Supreme Court held in *Blakely* that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 124 S. Ct. at 2537 (emphasis omitted) (citing *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)).

¶47 The *Blakely* Court did not explicitly identify the proper standard of review. *See Blakely*, 124 S. Ct. at 2538. The Court held that "because the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid." *Blakely*, 124 S. Ct. at 2538. This indicates that when a judge imposes an exceptional sentence not based on *"the facts reflected in the jury verdict or admitted by the defendant,"* the court commits fatal error. *Blakely*, 124 S. Ct. at 2537. *Blakely* characterized the right to a trial by jury as "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely*, 124 S. Ct. at 2538-39.

¶48 The facts in *Blakely* support the application of automatic error. *Blakely* pleaded guilty to second degree kidnapping involving domestic violence and use of a fire-

arm. In accord with the plea agreement, the State recommended a sentence within the 49- to 53-month standard range. *Blakely*, 124 S. Ct. at 2535. On hearing the victim's description of the kidnapping, however, the trial court imposed an exceptional sentence of 90 months on the grounds of deliberate cruelty. *Blakely*, 124 S. Ct. at 2535. Blakely objected, causing the court to hold a bench hearing. *Blakely*, 124 S. Ct. at 2535. The trial court again determined that Blakely's crime involved deliberate cruelty. *Blakely*, 124 S. Ct. at 2536. Because Blakely challenged the exceptional sentence at the trial court level, the Court would have applied harmless error review if *Blakely* announced a procedural rule. Instead, it reversed and remanded without stating a standard of review. This indicates that Blakely suffered a structural error, resulting in automatic reversal.

¶49 The dissent discusses the applicability of *Schriro v. Summerlin*, __ U.S. __, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004), to the present case. In *Summerlin*, the Supreme Court addressed whether *Ring*, 536 U.S. 584, applied retroactively to cases already decided on direct review. *Summerlin*, 124 S. Ct. at 2522. The Court specifically discussed whether the new rule set forth in *Ring* was a substantive rule or a procedural rule. *Summerlin*, 124 S. Ct. at 2523. It held that the rule was procedural and thus the jury fact-finding requirement discussed in *Apprendi*, 530 U.S. at 490 (a defendant has a right to a jury trial on aggravating factors formerly considered by a sentencing court), did not apply to those cases already final on direct review. *Summerlin*, 124 S. Ct. at 2523-24. The dissent argues that violations of *Apprendi*'s jury fact-finding requirement require review under the constitutional harmless error test. But the parties here have not raised *Summerlin* to point out any inconsistency between *Summerlin* and *Blakely*. Nor has the Supreme Court decided any case trying to harmonize *Summerlin* with *Blakely*. Therefore, we in the majority are not going to create a distinction. We are going to follow the plain line of

*Apprendi*, *Neder*, and *Blakely*, which hold that this is a structural error and harmless error cannot apply.

¶50 The trial court erred when it imposed an exceptional sentence without submitting it to a jury to find beyond a reasonable doubt aggravating factors that would support the exceptional sentence. We vacate the exceptional sentence and remand for sentencing consistent with *Blakely*. For the purposes of compliance with *Blakely*, we follow *State v. Hughes*, 154 Wn.2d 118, 151-52, 156, 110 P.3d 192 (2005) and remand for resentencing within Fero's standard sentence range.

HOUGHTON, J., concurs.

¶51 QUINN-BRINTNALL, C.J. (concurring in part and dissenting in part) — I agree with those portions of the majority opinion holding that the evidence was sufficient to support the properly instructed jury's verdict that Fero was guilty of first degree assault of a child for inflicting grievous bodily harm on the 15-month-old girl she was babysitting.[2] But I dissent from that portion of the opinion holding that *Blakely* violations are structural errors requiring automatic reversal.

¶52 On the same day that the United States Supreme Court issued its opinion in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), it issued *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 159 L. Ed.

---

[2] I also agree with the majority decision to adopt the rationale and holding of *State v. Harris*, 123 Wn. App. 906, 99 P.3d 902 (2004), allowing for the convening of a jury at the sentencing proceeding. I note that more than 20 years ago our Supreme Court set precedent for such remedy. In *State ex rel. Herron v. Browet, Inc.*, 103 Wn.2d 215, 691 P.2d 571 (1984), our Supreme Court superimposed a case law due process requirement for a jury trial onto a contempt statute that did not otherwise provide for trial by jury. *Browet*, 103 Wn.2d at 220; RCW 7.48.080 (moral nuisance).

2d 442 (2004). In *Summerlin*, the Court was asked to determine whether its decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (announcing a defendant's right to a jury trial on aggravating factors formerly considered by a court at sentencing), as applied to death penalty decisions in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), was a procedural or substantive change in the law. If substantive, i.e., "altering the range of conduct or the class of persons that the law punishes," the *Apprendi* rule would be applied retroactively to death penalty cases already final on direct review; if procedural, i.e., "regulating only *the manner of determining* the defendant's culpability," *Apprendi*'s jury trial right on sentencing factors would apply only prospectively. *Summerlin*, 124 S. Ct. at 2523. The *Summerlin* majority concluded that *Ring*'s holding was procedural:

> *Ring*'s holding is properly classified as procedural. *Ring* held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." [*Ring*, 536 U.S. at 609]. Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury." [*Ring*, 536 U.S. at 609]. This holding did not alter the range of conduct Arizona law subjected to the death penalty. It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts.

*Summerlin*, 124 S. Ct. at 2523 (first and third alteration in original). The Court also rejected Summerlin's argument that even if the rule was procedural, it would fall under the retroactivity exception for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Summerlin*, 124 S. Ct. at 2520 (quoting *Saffle v. Parks*, 494 U.S. 484, 495, 110 S. Ct.

1257, 108 L. Ed. 2d 415 (1990)). Citing *Blakely*, the Court noted:

> The question here is not, however, whether the Framers believed that juries are more accurate factfinders than judges (perhaps so—they certainly thought juries were more independent). Nor is the question whether juries actually *are* more accurate factfinders than judges (again, perhaps so). Rather, the question is whether judicial factfinding so *"seriously* diminishes" accuracy that there is an " 'impermissibly large risk' " of punishing conduct the law does not reach. The evidence is simply too equivocal to support that conclusion.

*Summerlin*, 124 S. Ct. at 2525 (citations omitted).

¶53 There are two consequences that flow from *Summerlin*'s ruling characterizing *Apprendi* as procedural. First, as a procedural rule, the jury fact-finding requirement does not apply to cases already final on direct review. *Summerlin*, 124 S. Ct. at 2523. Secondly, as a procedural rule, its violation cannot be a structural error requiring automatic reversal. Instead, violations of *Apprendi*'s jury fact-finding requirement are subject to review under the constitutional harmless error test.

¶54 The Supreme Court demonstrated its view that a constitutional harmless error test properly applied to *Apprendi* violations in *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002). In *Cotton*, the government conceded that the indictment failed to allege a fact (drug quantity) that increased the statutory maximum sentence and rendered the defendant's enhanced sentence erroneous under *Apprendi* and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). The government also conceded that the error was plain and could be raised for the first time on appeal. The Court, however, concluded as follows:

> The third inquiry is whether the plain error "affected substantial rights." This usually means that the error "must have affected the outcome of the district court proceedings." [*United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)]. Respondents argue that an indictment error

falls within the "limited class" of "structural errors," [*Johnson v. United States*, 520 U.S. 461, 468-69, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997),] that "can be corrected regardless of their effect on the outcome," [*Olano*, 507 U.S. at 735]. Respondents cite *Silber* v. *United States*, 370 U.S. 717[, 82 S. Ct. 1287, 8 L. Ed. 2d 798] (1962) (*per curiam*), and *Stirone* v. *United States*, [361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960),] in support of this position. The Government counters by noting that *Johnson*'s list of structural errors did not include *Stirone* or *Silber*, and that the defendants in both of these cases preserved their claims at trial.

As in *Johnson*, we need not resolve whether respondents satisfy this element of the plain-error inquiry, because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. The error in *Johnson* was the District Court's failure to submit an element of the false statement offense, materiality, to the petit jury. The evidence of materiality, however, was "overwhelming" and "essentially uncontroverted." We thus held that there was "no basis for concluding that the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' "

The same analysis applies in this case to the omission of drug quantity from the indictment. The evidence that the conspiracy involved at least 50 grams of cocaine base was "overwhelming" and "essentially uncontroverted." . . . Surely the grand jury, having found that the conspiracy existed, would have also found that the conspiracy involved at least 50 grams of cocaine base.

. . . .

. . . . The real threat then to the "fairness, integrity, and public reputation of judicial proceedings" would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.

*Cotton*, 535 U.S. at 632-34 (footnotes and some citations omitted).

¶55 Although *Summerlin* and *Cotton* addressed issues of retroactivity and issue preservation, each analysis rests on the Court's ruling that *Apprendi* jury fact-finding violations

are procedural rather than "substantive" (*Summerlin*) or "structural" (*Cotton*). *Blakely*'s extension of the *Apprendi* jury fact-finding requirements to exceptional sentences is necessarily the application of a procedural and not structural requirement and any violation is subject to harmless error review under the constitutional overwhelming uncontroverted evidence test. *See, e.g., State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996).

¶56 In holding that *Blakely* errors are structural and require automatic reversal, the majority relies on *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). There, the Court held that a constitutionally deficient reasonable doubt instruction requires automatic reversal. *Sullivan*, 508 U.S. at 278-82. At first blush, the following passage from *Sullivan* supports today's majority:

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan*, 508 U.S. at 279. But the United States Supreme Court has never held that automatic reversal is required when a jury does not decide every element of a crime. Indeed, in *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), the Court held that when applied to an element omitted from a jury instruction and, thus, never formally decided, the error is harmless if uncontroverted evidence supports the reviewing court's finding of the element beyond a reasonable doubt. *See also Cotton*, 535 U.S. at 633 (no automatic reversal where grand jury did not find that the conspiracy involved at least 50 grams of cocaine). I fail to see how, under *Neder*, an appellate court may find harmless the absence of a jury finding of an element beyond a reasonable doubt but may not find harmless the absence of a sentencing element

under identical circumstances, especially when the element was found by the trial judge. Simply put, while relieving the burden of proof, as in *Sullivan*, is a "structural" error (because neither judge nor jury ever finds the elements beyond a reasonable doubt), no such structural error exists when the jury finds all elements beyond a reasonable doubt and the judge, rather than the jury, finds disputed sentencing factors.

¶57 Whatever the allure and wisdom might be in the first instance of the majority's easily applied ruling, I cannot agree that the *Apprendi/Blakely* jury fact-finding requirement is a structural change. On the same day it issued its opinion in *Blakely*, this nation's highest court determined its rule forbidding a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty is procedural. That decision necessarily controls here and we must apply the constitutional harmless error test to *Blakely* violations.

¶58 In my view, applying this constitutional harmless error test to the evidence presented to Fero's jury establishes conclusively that the 15-month-old victim was vulnerable because of her young age and that, as the victim's caregiver, Fero had a responsibility to protect the victim from harm. Error in failing to submit these factors to the jury for determination was harmless beyond a reasonable doubt. The uncontroverted evidence presented at trial was so overwhelming that no jury on finding beyond a reasonable doubt that Fero assaulted the child (inflicting a subdural hematoma; bilateral hemorrhages; a laceration on the inside of her labia; large bruises on her cheeks, chin, chest, the area above her vagina, and on the labia majora; and an oblique spiral fracture of her left tibia) would not also have found, if instructed to do so, that Fero owed a duty to protect the child as the child's babysitter, and that a 15-month-old child was vulnerable and by virtue of her age unable to protect herself from Fero's assault.

¶59 Thus, on this record, the trial court's failure to submit aggravating sentencing factors to the jury for delib-

eration as required by *Blakely*, was harmless error. I would affirm Fero's conviction and sentence in all respects and respectfully dissent from that portion of the majority opinion to the contrary.

Review granted and case remanded to the Court of Appeals at 154 Wn.2d 1032 (2005).