**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 0 1 2018

for CHIEF JUSTICE

This opinion was filed for record
at 8:00am on Feb 1, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In re the Personal Restraint of | ) | |
| | ) | |
| Heidi Charlene Fero, | ) | No. 92975-1 |
| | ) | |
| Respondent. | ) | En Banc |
| | ) | |
| | ) | |
| | ) | Filed   FEB 0 1 2018 |
| | ) | |
| | ) | |

GONZÁLEZ, J.—On a January night in 2002, Heidi Charlene Fero called emergency responders seeking help for an injured child. Minutes later, paramedics arrived and found fifteen-month-old Brynn Ackley unconscious and limp, with bruising on her face. Brynn's treating physicians later determined that she had suffered severe and debilitating injuries consistent with shaken baby syndrome: retinal hemorrhaging (bleeding in the eyes), cerebral edema (brain swelling), subdural hematoma (brain bleeding), a leg fracture, and large bruises on her pelvic and vaginal areas. 2 Verbatim Report of Proceedings (VRP) (Mar. 11, 2003) at 183-85, 191; VRP (Mar. 13, 2003) at 13-14. Fero was charged and convicted of first degree child assault. In 2014, many years after her judgment became final,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

she filed a personal restraint petition contending that the medical community's evolving understanding of shaken baby syndrome is newly discovered evidence that would undermine the expert evidence as to the causes and timing of Brynn's injuries. We hold that this evidence would not probably change the result at trial. *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001). We therefore dismiss Fero's petition.

BACKGROUND

On January 7, 2002, Fero was babysitting Brynn and her four-year-old brother, Kaed, as she had occasionally done since August 2002. At around 2:00 p.m. that day, Brynn and Kaed were dropped off at Fero's home by their mother, Breanne Franck. Fero's then-boyfriend, Dustin Goodwin, watched Kaed and Brynn as well as Fero's children, Rachel and Derrick. Fero returned home around 3:00 p.m. and Goodwin left for work. For the rest of the night Fero was alone caring for the four children.

Around 7:45 p.m., Fero called Jason Ackley, Brynn and Kaed's father. She reported that Kaed had pushed his sister's head into a wall and Brynn could not walk on one leg. Fero asked how best to discipline Kaed. A few hours later, Fero called her mother, panicked because Brynn was unresponsive. Fero's mother instructed her to call 911 immediately.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

When paramedics arrived, they found Brynn "limp, like a rag doll" with obvious bruises on her face and chest, and blood in her mouth. 1 VRP (Mar. 11, 2003) at 39-41. Fero explained to the emergency responders that she had not personally witnessed Brynn's injuries and her daughter told her Kaed had swung Brynn into the wall "like a baseball bat." *Id.* at 40. While in transport to the hospital, paramedics observed Brynn's facial bruising grow rapidly.

At the hospital, multiple physicians examined and treated Brynn. One emergency room doctor reviewed her CAT (computed axial tomography) scan, which showed severe brain injury caused by a blood clot, bleeding, and swelling; another physician discovered hemorrhaging in both her eyes and another found she had a displaced fracture of her left tibia, bruising on her pelvis, and laceration on her vagina. Brynn underwent emergency surgery to remove the blood clot and a piece of bone from her skull to allow her brain to swell. Later, Brynn's therapists predicted that as a result of her trauma, she would likely never live without the need of a caregiver.

Fero was charged with first degree child assault. At trial, the defense argued that Kaed caused Brynn's injuries. Fero testified that Kaed was difficult to care for

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

and was often aggressive toward his sister.[1] Kaed's father echoed this characterization, clarifying that while Kaed sometimes pushed and pinched Brynn, he never injured her and described the behavior as "hard" playing. *Id.* at 126-30, 144.

Goodwin, Fero's then-boyfriend, testified that on January 7, 2002, Brynn's mother had carried the infant into the house in her car seat—an unusual occurrence according to Goodwin because normally the child was brought in first, her mother then returning to the car to retrieve the car seat separately. Goodwin also asserted that during his brief time watching the children until Fero returned from work, Brynn appeared upset, refused to play, and cried whenever her leg was touched.

Unlike Goodwin, Breanne Frank testified she saw no bruises or injuries to the child when she brought her to Fero's apartment. Frank stated that her daughter had no trouble walking and that she carried Brynn into the home as usual, retrieving the car seat after. Regarding her son, Frank admitted that she had heard about Kaed pinching his sister and had seen him kick and jump on her. She acknowledged Kaed could be mean to his sister, but Frank thought it was only sibling rivalry that caused slight bruises and never injured Brynn.

---

[1] Fero explained that at her son's birthday party in 2001, Kaed was disciplined by his father for throwing food at guests and in response the boy became angry enough to slam his fists into a glass tabletop and crack it.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fero testified to the timeline of Brynn's injuries and remarked on the little girl's behavior while at Fero's home. She explained that Brynn was "distant" and remained sitting wherever Fero set her instead of following Fero around as she had in the past. 5A VRP (Mar. 17, 2003) at 75. Fero also stated she gave Brynn a bath that evening, noticing a large bruise on the child's pelvis which "disturbed" her. *Id.* at 77. Fero dressed Brynn and put her in the playpen downstairs where Kaed and Rachel were watching television. Fero then took her son, Derrick, upstairs. While bathing Derrick, Fero's daughter reported that Kaed was hurting Brynn; Fero checked downstairs and saw Kaed on the couch and Brynn in her crib. Fero went back upstairs to tend to her son. Soon Rachel returned to her mother's side saying that Kaed was once more hurting his sister by banging Brynn's head against the wall.

Downstairs, Fero saw Kaed scramble out of Brynn's crib; the little girl was on her hands and knees, "shaking and trembling more than [Fero had] seen a child do before." *Id.* at 82. Fero picked her up and saw a small amount of blood in her mouth. She asked Kaed what he had done and he responded that he was a Power Ranger. After comforting Brynn, Fero said the infant closed her eyes, relaxed, and appeared to fall asleep.

Fero then put Brynn on the futon and called Ackley at about 7:45 p.m. Both Fero and Ackley testified that she told him about Brynn's inability to walk on one

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

leg and seeing Kaed push Brynn's head into a wall. But Fero did not mention any bleeding or bruising, according to Brynn's father; moreover, Ackley testified that Brynn was running around with no trouble and had no bruises when he left for work that day. Goodwin's testimony largely agreed with this version of events, adding that Fero had told him about the bruises and bleeding in Brynn's mouth.

After calling Ackley, Fero proceeded to clean the house, checking on the children intermittently. At approximately 9:45 p.m., Fero noticed Brynn's eyes were lidded and that something was not "right." *Id.* at 88. When her attempts to wake Brynn were unsuccessful, Fero called her mother and then 911.

Police arrived at Fero's home after Brynn was taken to the hospital. Fero provided a written statement explaining how Kaed jumped out of the crib and that Fero saw blood in Brynn's mouth; she also stated that she checked on Brynn "in a few minutes" after putting her on the futon and found she was unresponsive. *Id.* at 102-03. Fero testified that she did not remember writing the statement or telling an officer that five minutes had passed from when she put Brynn on the futon and when she noticed Brynn's eyes were half open. Further, Fero admitted to telling the 911 operator that Kaed was "'chasing [his] sister'" and that when she came downstairs, she saw Kaed bash Brynn's head into a wall. *Id.* at 98-99. Fero said she was too upset to think clearly and so could not remember saying these things to the investigators.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

Kaed and Rachel also testified at trial. Six-year-old Rachel stated that Brynn was injured when Kaed "push[ed] her into the wall" and hit her with toys. *Id.* at 43. She testified that when she saw this, she went upstairs to tell Fero, who checked on the children downstairs. Rachel remembered telling the police officer that Kaed hit Brynn with toys, and that no one had instructed her to say it. Rachel also told police that Brynn was running around playing the day she was injured.

Five-year-old Kaed testified that he heard Brynn crying upstairs the night she was hurt. Kaed stated that he went upstairs and saw Fero giving a bath to Brynn and another child. He also said that Fero took Brynn downstairs and laid her on the couch. Later, according to Kaed, Fero yelled at him because she believed he did something to the little girl. Kaed testified that he had been in the crib at Fero's home but not on the day Brynn was injured and he denied doing "anything at Heidi's to her." 1 VRP (Mar. 12, 2003) at 12.[2]

The police officers that investigated the incident also testified. Officer Scott Telford testified that Fero recounted the events of the evening to him, which echo her testimony at trial. Notably, Fero told the officer that Brynn was crying in her crib with blood in her mouth. Officer Telford was unable to find blood or stains in

---

[2] Kaed's testimony contained many inconsistent statements. For example, he first testified that he did not know who "Heidi" was and yet later stated she was Brynn's babysitter. 1 VRP (Mar. 12, 2003) at 15-16. He also denied and then admitted hitting Brynn.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

the area. Detective Scott Smith testified that Fero told him the crib had been situated against the wall on the night of the incident but was later moved. He examined and photographed the crib and markings in the carpet. He determined that it had not been moved. Detective Smith also collected as evidence two plastic toys he was told may have caused Brynn's injuries.

Detective Steve Norton testified that he interviewed Fero the night Brynn was injured. Fero reported to him that she checked on the children downstairs twice that night, the second time seeing Kaed jump out of the crib. Detective Norton stated that Fero told him only five minutes passed from when she picked Brynn up and when she noticed the girl had fallen unconscious and called 911. Norton also testified that Fero said she had not given Brynn a bath and the infant had not been upstairs that day. Fero told him she had seen some red marks on Brynn's stomach and that Fero's daughter saw Kaed jump on and hit Brynn.

Detective Norton interviewed Kaed and his father, Ackley, on the night of January 7, 2002. Ackley reported that Kaed was rough with Brynn, pushing and pinching her, and needed to be watched to prevent him from hurting his sister. Norton testified that Kaed was "hyperkinetic" during the interview and seemed to admit to causing Brynn's bleeding from her mouth. 2 VRP (Mar. 12, 2003) at 212-13. Kaed told the detective he made the blood come out, then said the "temperature just push[ed] it out," and "[d]reams push it out." *Id.*

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fero's daughter, Rachel, was interviewed on January 8, 2002. Detective Norton testified that Rachel was focused, with a good attention span. The girl told Norton that Kaed banged Brynn's head into the wall, hit her with plastic toys, and shook Brynn's high chair when she was in it.

The State presented medical testimony from six expert witness about the cause of Brynn's injuries.[3] These witnesses, all physicians who treated Brynn, explained that the little girl suffered severe brain injury caused by a blood clot, bleeding, and swelling. The head trauma, bruising, and leg fracture were caused by severe shaking and "repetitive force," the type of force a boy of Kaed's size and strength could not inflict. 1 VRP (Mar. 12, 2003) at 63-64. One physician agreed it was possible that the pelvic bruising could be the result of a four-year-old jumping on Brynn, the facial bruises could be inflicted by hitting her with a plastic toy, and that such a blow could cause a subdural hematoma. But the doctor also stated that it was unlikely a plastic toy could cause a local brain injury such as Brynn's. Kaed could not inflict the "constellation" of injuries Brynn suffered. 2 VRP (Mar. 11, 2003) at 200.

The medical experts described shaken baby syndrome. When the brain is shaken, the veins in the brain break and start to bleed, and a collection of blood

_____

[3] Another medical expert also testified regarding Brynn's rehabilitation therapy that began after her hospitalization but did not opine on the cause of her injuries.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

forms in what is called a "subdural hematoma." 1 VRP (Mar. 12, 2003) at 84. Brynn had multiple hematomas and swelling in her brain, indicating severe trauma. Physicians found no external head injuries, such as a skull fracture, "goose egg," or scalp bleeding, which would be present if Brynn had been struck by a blow to her head; her doctors concluded that she had been severely shaken. *Id.* at 90-92.

In addition, the trauma to Brynn's brain could not have been caused by repeated blows to her face because "[t]he amount of force necessary to produce a brain injury of this magnitude. . . would destroy the face, there wouldn't be just bruises and swelling, there would be destruction of all the bones of the face." VRP (Mar. 13, 2003) at 34. The medical experts also testified that Brynn's injuries could not be caused by a fall, being pushed into a wall, or being hit with a plastic toy.

Regarding Brynn's leg injury, two physicians stated that it was a recent "displaced" or "pulled apart" oblique fracture of the left tibia. *Id.* at 13-14. Both doctors explained that in order to cause an oblique fracture such as this, a person would have to "twist the leg violently." *Id.* at 16. The physician who examined Brynn's X-rays stated he saw no indication that Brynn's bones were fragile, and, though agreeing a fracture could be sustained in a fall or by accident, medical experts stated that it would be very unlikely that Kaed had the strength to fracture

10

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

Brynn's leg in this manner. A child suffering from a displaced fracture would not walk on the leg because it would be extremely painful.

The medical experts also testified Brynn would likely have fallen unconscious at some point on the night of January 7, 2002. Given the severity of her injuries, multiple physicians stated that typically Brynn would have lost consciousness almost immediately after being shaken and would probably not have been consolable. Another doctor said it could take five minutes to two hours for signs of unconsciousness to manifest. Only one physician appears to have stated Brynn would have had no "lucid interval" after sustaining her injuries. *Id.* at 43. While unconscious, Brynn could have appeared to be sleeping and she may not have closed her eyes.

Fero was found guilty of first degree child assault. The court imposed an exceptional sentence, finding Brynn was particularly vulnerable due to her youth and that Fero had breached her duty to protect the little girl. Fero was sentenced to 15 years. She appealed and the court held the 15-year exceptional sentence violated *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 403 (2004). *State v. Fero*, 125 Wn. App. 84, 102, 104 P.3d 49 (2005). On remand, Fero was resentenced to 10 years. On May 6, 2014, Fero filed this personal restraint petition. She was released from prison in July 2014. *In re Pers. Restraint of Fero,* 192 Wn. App. 138, 148, 367 P.3d 588 (2016).

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

The Court of Appeals issued a published decision on January 5, 2016, granting Fero's petition and remanding for a new trial. *Id.* at 142. The State filed a motion for reconsideration on January 25, 2016. The Court of Appeals denied the motion on March 3, 2016. Less than thirty days later, on April 1, 2016, the State petitioned for review. The petition was redesignated as a motion for discretionary review,[4] which we granted. *In re Pers. Restraint of Fero*, 187 Wn.2d 1024, 390 P.3d 356 (2017).

ANALYSIS

I.     TIMELINESS OF THE STATE'S MOTION FOR DISCRETIONARY REVIEW

Fero and the State agree that a party has 30 days to file a motion for discretionary review with this court. As previously stated, the State filed for review on April 1, 2016. Fero contends the motion is untimely because it was not filed within 30 days of the Court of Appeals' January 5 decision granting her personal restraint petition. Conversely, the State argues its motion was timely because the 30-day filing deadline began with the Court of Appeals' March 3 decision denying its motion for reconsideration. Thus, the threshold question in

---

[4] The clerk of this court correctly treated the State's petition for review as a motion for discretionary review under RAP 16.14(c). To avoid confusion, we will refer to the State's petition as a motion for discretionary review throughout.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

this case is what "decision" under RAP 13.5(a) initiates the 30-day filing deadline for discretionary review with this court. We agree with the State.

If a personal restraint petition is "decided by the Court of Appeals on the merits, the decision is subject to review by the Supreme Court only by a motion for discretionary review . . . [as] provided in rule 13.5A." RAP 16.14(c). Additionally, a party may seek review of the decision to grant or deny a personal restraint petition by filing a motion for reconsideration. RAP 12.4(a). A pleading is considered timely filed if it is timely filed in any division of the Court of Appeals or in the Supreme Court. RAP 18.23.

The procedure governing a motion for discretionary review is specified in RAP 13.5(a) and (c). RAP 13.5A(c). RAP 13.5(a) states:

> A party seeking review by the Supreme Court of an interlocutory decision of the Court of Appeals must file a motion for discretionary review in the Supreme Court and a copy in the Court of Appeals within *30 days after the decision is filed.*

(Emphasis added.)

Most obviously, the emphasized phrase provides a period of 30 days in which to file a motion for review and a date from which to begin counting "the decision." But, the rule's language alone does not define what type of "decision" begins the filing deadline. Because this term is not defined within RAP 13.5(a), we look to the context, related rules, and rule-making scheme as a whole to

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

determine its meaning. *State v. Stump*, 185 Wn.2d 454, 460, 374 P.3d 89 (2016) (citing *State v. Conover*, 183 Wn.2d 706, 711, 355 P.3d 1093 (2015)).

Presumably, Fero would direct us to RAP 13.5A for guidance. This rule governs motions for discretionary review of decisions dismissing or deciding personal restraint petitions. RAP 13.5A(a)(1). Thus, because this rule is triggered when a party files for review of a decision deciding a personal restraint petition as the State did here, the undefined "decision" of RAP 13.5(a) must relate to the original January 5 Court of Appeals opinion.

This argument would be persuasive if our analysis ended here. However, just as we look to the related provision RAP 13.5A in order to decipher and carry out the drafter's intent, we must also consult the rules in their entirety. *Stump*, 185 Wn.2d at 460 (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). In doing so, RAP 1.2(a) is of critical importance. This rule governs our interpretation of the Rules of Appellate Procedure and explains:

> These rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits. Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands.

RAP 1.2(c) provides that "[t]he appellate court may waive or alter the provisions of any of these rules in order to serve the ends of justice, subject to the restrictions in rule 18.8(b) and (c)." In light of RAP 1.2(a)'s directive to construe

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

our rules "liberally" and not to dismiss a case solely on the basis of "noncompliance" with these rules, Fero's reading of RAP 13.5(a)'s "decision" is unnecessarily rigid. Concluding that the January 5 decision begins the 30-day filing deadline would not "facilitate the decision of cases on the merits" as this case would be dismissed without regard for the significant underlying issues ably argued by both Fero and the State. Such a summary dismissal would not be in keeping with RAP 1.2(a).

Moreover, as the State points out, Fero's interpretation of RAP 13.5(a) would require a party to file a motion for discretionary review very likely before the Court of Appeals issued its decision on reconsideration. Pet'r's Reply to Answer at 4. Not only would Fero's case be pending in two courts at once, had the Court of Appeals granted the motion for reconsideration, the State may not have sought further review. Requiring multiple motions in multiple courts before an opinion that may decide the case is issued is inefficient for those seeking appellate review, as well as for the court. To construe RAP 13.5(a) in this way is unnecessary and risks signaling to parties that form matters more than substance.[5]

---

[5] We look to RAP 1.2(a) for guidance in interpreting our rules of appellate procedure. Invoking this provision does not accordingly mean that we have waived timely filing requirements contained in RAP 13.5.

Thus, we conclude that the "decision" initiating the 30-day filing period under RAP 13.5(a) is the order on reconsideration. Here, the Court of Appeals denied reconsideration on March 3, 2016 and the State filed for review with this court less than 30 days later on April 1, 2016. The State complied with RAP 13.5(a), and its motion for discretionary review was timely.

## II. NEWLY DISCOVERED SCIENTIFIC EVIDENCE

Fero contends that the scientific community's advancements in understanding shaken baby syndrome constitute newly discovered evidence that undermines the State's theory of the case and entitles her to a new trial. The State contends this evidence is not newly discovered because it would not probably change the result at trial. We agree with the State and dismiss the petition.

### A. STANDARD OF REVIEW

Fero challenges her postrelease restrictions through a personal restraint petition. As this court has noted, personal restraint petitions are the modern version of the writs of old, most notably the "Great Writ" of habeas corpus. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 128, 267 P.3d 324 (2011); *Toliver v. Olsen*, 109 Wn.2d 607, 608, 746 P.2d 809 (1987). Our review of these petitions is constrained, and relief gained through collateral challenges is "extraordinary." *In re Coats*, 173 Wn.2d at 132 (citing *In re Pers. Restraint of Cook*, 114 Wn.2d 802,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

810-12, 792 P.2d 506 (1990)). A personal restraint petition, like its ancestor the Great Writ, is not granted "as a matter of course." *See In re Frederich*, 149 U.S. 70, 75, 13 S. Ct. 793, 37 L. Ed. 653 (1893). The bar facing a petitioner is high, and overcoming it is necessary before this court will disturb a settled judgment. *In re Coats*, 173 Wn.2d at 132.

The right to collateral review by a personal restraint petition requires the petitioner to make a heightened showing of prejudice. *In re Cook*, 114 Wn.2d at 810 (citing *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984)). A personal restraint petitioner must state "with particularity facts which, if proven, would entitle him [or her] to relief." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). "Bald assertions and conclusory allegations" alone are insufficient. *Id.*; RAP 16.7(a)(2)(i).

Fero filed her personal restraint petition more than one year after her judgment became final, RCW 10.73.090(1), thus the petition is untimely unless she raises only grounds for relief exempt from the one-year limit under RCW 10.73.100. *See In re Pers. Restraint of Adams*, 178 Wn.2d 417, 422, 309 P.3d 451 (2013). Newly discovered evidence is a potentially exempt ground for relief. RCW 10.73.100(1); RAP 16.4(c)(3); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319-20, 868 P.2d 835 (1994).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The court reviews a claim of newly discovered evidence raised by a personal restraint petition under the same test as newly discovered evidence asserted in a new trial motion. *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). To prevail on a claim of newly discovered evidence, a personal restraint petitioner must show evidence that (1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *Id.* If any of these factors is missing, the petitioner is not entitled to relief. *Id.*

B. SUPPORTING DECLARATIONS

Fero submitted declarations from Drs. Patrick Barnes and Janice Ophoven in support of her petition. Dr. Ophoven, a pediatric forensic pathologist, and Dr. Barnes, a pediatric neuroradiologist, specialize in shaken baby syndrome and pediatric head trauma.[6] Both physicians focused on changes in the medical understanding of shaken baby syndrome and infant head injuries since Fero's trial.

In his declaration, Dr. Barnes explains that alternative explanations for symptoms once associated with shaken baby syndrome have expanded to include

---

[6] Dr. Barnes is the chief of pediatric neuroradiology at Lucile Salter Packard Children's Hospital and professor of radiology at Stanford Medical Center. He has practiced, taught, and published articles, reviews, and book chapters on head injury in children for 35 years. Dr. Ophoven has expertise in shaken baby syndrome cases and has practiced as a physician for nearly 40 years.

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

accidental and natural causes. Since 2003, members of the scientific community now question whether the brain swelling and bleeding in the eyes and brain are definitive signs of shaken baby syndrome. In the 1990s, doctors routinely testified that the force necessary to cause hemorrhaging in children was equivalent to the force from a high speed car accident or fall from multistory building. Dr. Barnes asserts that "several literature reviews" have shown no scientific basis for this testimony. Barnes Decl. at 5 (included as an exhibit in Opening Br. in Supp. of Pers. Restraint Pet.). He also states that researchers have recognized that children who suffer trauma can remain lucid (conscious) for up to three days or more after injury. Dr. Barnes concludes, "[I]t is impossible to tell . . . in the medical record when Brynn was injured, and there is a significant chance that she was injured before she arrived at Ms. Fero's home." *Id.* at 26-27.

Dr. Barnes states in his declaration that the medical community once universally accepted that victims of shaken baby syndrome would fall unconsciousness immediately after injury. Since Fero's trial, it is now generally accepted that short and accidental falls can cause injuries like Brynn's and children can be lucid and "appear symptom-free" for up to three days. Ophoven Decl. at 4 (included as an exhibit in Opening Br. of Supp. of Pers. Restraint Pet.).

Dr. Ophoven concludes that Brynn suffered a traumatic brain injury but could not determine whether the injury was accidental or nonaccidental or whether

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

an adult or child caused it. The doctor also explains that the timing of Brynn's injuries could not be exactly determined but that "[i]t is more likely [she] suffered her injuries between 12 and 24 hours before" arriving at the hospital. *Id.* at 3.

## C. MERITS OF THE PETITION

Fero contends that the result of her trial would probably be different because the medical community's current understanding of pediatric head trauma contradicts the medical testimony offered at trial on which she was convicted. Fero focuses on two advancements in shaken baby syndrome research, arguing scientists now recognize that (1) a child does not immediately fall unconscious after suffering a traumatic brain injury and (2) many causes other than severe shaking can inflict injuries such as those Brynn suffered. Fero argues that had this evidence been presented to the jury, the State could not have proved Brynn was injured in Fero's care and Fero injured the little girl.

The declarations from Dr. Barnes and Dr. Ophoven state that children can remain lucid for up to three days postinjury. This, Fero argues, undermines the State because it presented medical evidence of unconsciousness occurring "'immediately'" after injury. Resp't's Suppl. Br. at 5-6. But Fero characterizes the State's evidence in a light most favorable to her. *See, e.g., id.* ("The State's trial experts testified that it would have been *impossible* for Brynn to remain lucid

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

for more than a few minutes after suffering her injuries." (emphasis added)). Reviewing the medical testimony as a whole demonstrates that the trial experts described the general shaken baby syndrome case in which "*typically* a patient loses consciousness right away," 1 VRP (Mar. 12, 2003) at 97 (emphasis added), and that there would "[*p*]*robably* not" be a lucid interval between injury and onset of symptoms. VRP (Mar. 13, 2003) at 43 (emphasis added). The State's witnesses did not state that Brynn necessarily immediately lost consciousness after being injured. Had the experts offered this categorical conclusion, Fero's lucidity evidence may have sufficiently refuted it.

Furthermore, even though some State experts testified that a typical victim of shaken baby syndrome would lose consciousness immediately, the jury also heard testimony that signs of unconsciousness in victims could take anywhere from a few minutes to a few hours to manifest. Thus, the jury was already presented with the theory that Brynn could have been conscious for hours after she was injured. Fero does not address this point.

Accepting arguendo that a child can remain conscious for up to three days after traumatic brain injury and that Brynn followed this lucidity pattern, though we note Fero alleged no particular facts showing this, such evidence merely invites the inference that Brynn *might* have been injured before January 7, 2002. Fero urges us to conclude from this possibility that someone else injured the little girl.

21

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

Fero fails to show, however, how this evidence would have changed the result at trial since her theory of the case, at its most basic, was that someone else injured Brynn—indeed, she argued Kaed was to blame. Conceivably, the evidence could point to an alternative suspect in addition to Kaed, namely Brynn's parents, thus widening the field of possible suspects and strengthening Fero's theory. But strengthening the defense's trial theory is not the standard for newly discovered evidence. *State v. Gassman*, 160 Wn. App. 600, 609, 248 P.3d 155 (2011) ("the standard is 'probably change,' not just possibly change the outcome" (quoting *Williams*, 96 Wn.2d at 223)); *see also State v. Riofta*, 166 Wn.2d 358, 369, 209 P.3d 467 (2009) ("defendants seeking postconviction relief face a heavy burden and are in a significantly different situation than a person facing trial" (citing *Schlup v. Delo*, 513 U.S. 298, 326 n.42, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).

Fero also asserts, through her declarations, that short falls or natural causes present alternative explanations for Brynn's injuries. The State's experts testified that the type and severity of Brynn's injuries could only have been caused by violent shaking or trauma akin to falling from a multi-story building or being ejected from a moving vehicle. The jury might have doubted whether Fero violently shook the infant if it had been presented with testimony that a short fall from a counter or chair could cause head trauma like Brynn's. Fero contends this

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

evidence would have changed the result at trial because the State could not prove she assaulted Brynn.

This argument is unconvincing. Fero did not present at trial or allege in her personal restraint petition any evidence that Brynn suffered a fall—accidental or nonaccidental, short or long, either in Fero's care or at any other time.[7] In support of her contention that an accidental event could have caused Brynn's head injuries, Fero cites *Ex Parte Henderson*, 384 S.W.3d 833, 833-34 (Tex. Crim. App. 2012) (per curiam). In *Henderson*, a defendant was granted a new trial after expert witnesses testified the child victim's injuries could have been caused by a short fall onto concrete. *Henderson* is distinguishable because, unlike in Fero's trial, testimony was offered that the child had accidentally fallen from the defendant's arms onto a concrete floor. *Id.* at 838 (Cochran, J., concurring). Here, nothing in the record suggests an accidental cause of Brynn's injuries. The record similarly fails to show and Fero's petition does not allege that Brynn suffered from any medical conditions that may have caused or contributed to her injuries. Dr. Ophoven recognized this in her declaration, stating "[n]othing in the materials that [she] reviewed suggested that there were vascular, congenital, infectious or

___

[7] Rachel told a police officer that Brynn was in a high chair and Kaed had shaken her while in the chair. At trial, however, Rachel stated she did not remember telling the officer this, and no other witnesses testified to this information. Furthermore, even if Rachel had told the jury that Kaed shook the chair while Brynn was in it, no evidence was offered that Brynn *fell* from the chair.

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

metabolic causes for the cerebral edema, subdural hematoma or the retinal hemorrhages." Ophoven Decl. at 8.

Fero's further citations to cases from other jurisdictions are similarly unpersuasive. For example, Fero cites *Del Prete v. Thompson*, 10 F. Supp. 3d 907 (N.D. Ill. 2014) and *People v. Bailey*, 144 A.D.3d 1562, 41 N.Y.S.3d 625 (2016). These cases recognize longer periods of consciousness posttrauma and alternative causes for injuries once considered diagnostic of abuse. *Del Prete*, 10 F. Supp. 3d at 956-57; *Bailey*, 144 A.D.3d at 1564.

Both cases are distinguishable on their facts. In *Del Prete*, the child victim had been taking antibiotic medication for an infection, had a history of hospitalization, and displayed subdural head injuries two to four weeks before the alleged shaking. 10 F. Supp. 3d at 910, 956. In *Bailey*, undisputed evidence was presented that the two-and-a-half-year old victim had fallen from a bench and hit her head. *Bailey*, 144 A.D.3d at 1562-63; *see also People v. Bailey*, 47 Misc. 3d 355, 357, 999 N.Y.S.2d 713 (Monroe County Ct. 2014). The prosecution's expert witnesses testified at trial that short falls are rarely fatal. *Bailey*, 47 Misc. 3d at 358-59, 363. On collateral review, the court's opinion discussed in detail the evidence of the fall and the scientific community's advancements in this arena, concluding that the evidence "significantly, and substantially, undermines" the prosecution's trial testimony. *Id.* at 372-73. Unlike *Del Prete* and *Bailey*, Brynn

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

had no history of hospitalization and did not display weeks' old head injuries, nor was any evidence offered that she had fallen while in Fero's care or outside it.

In addition, Fero relies on *State v. Edmunds*, 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590 for analogous facts and its consideration of recent shaken baby syndrome research in the context of postconviction review. *See also In re Fero*, 192 Wn. App. at 157-60. In *Edmunds*, a caregiver was convicted of reckless homicide for shaking a seven-month-old child. 308 Wis. 2d at 378-79. At Edmunds's trial, the State's experts testified that violent shaking caused the victim's head trauma. *Id.* at 378. The Wisconsin Court of Appeals held that Edmunds presented medical testimony showing a legitimate debate over whether infants can be fatally injured through shaking, the length of lucidity periods, and alternative causes that may mimic the symptoms once viewed as indicating shaken baby syndrome. *Id.* at 385-86. The *Edmunds* court reasoned that today a jury would encounter competing medical opinions concerning the cause of the victim's injuries, and that there was a reasonable probability that a jury faced with both the new and old medical testimony would have reasonable doubt as to Edmunds's guilt. *Id.* at 392. The court concluded this constituted newly discovered evidence that would probably change the result at trial. *Id.*

Here, Fero's petition leans heavily on *Edmunds* for support. Such reliance is understandable; *Edmunds* is one of the first cases in the country to provide relief to

25

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

petitioners collaterally challenging their convictions based on shaken baby syndrome.[8] While Fero's reliance may be understandable, it is nevertheless misplaced.

*Edmunds* is distinguishable because it does not present a similar factual background as the instant case. Though both children exhibited traumatic brain injuries, *Edmunds*, 308 Wis. 2d at 380, Brynn displayed extensive bruising on her face, chest, abdomen, and vaginal areas. Her vagina was lacerated and her leg severely fractured. It is not any one of these injuries alone that makes this case different from *Edmunds*, but all of them together. The dissent misunderstands our analysis on this point. *See* dissent (Gordon McCloud, J.) at 17, 18. Brynn Ackley's internal and external injuries differ significantly from those suffered by the victim in *Edmunds*. It is possible that in a different case, one resting solely or primarily on internal traumatic brain injuries, such as in *Edmunds*, Fero's lucidity and alternative cause evidence may meet the requisite standard for relief. That is not the case here.

Therefore, a jury in Fero's case today would be faced with testimony stating that Brynn's injuries might have been caused by an accidental fall or medical

---

[8] *See* Andrea L. Lewis & Sara L. Sommervold, *Death, But Is It Murder? The Role of Stereotypes and Cultural Perceptions in the Wrongful Convictions of Women*, 78 ALB. L. REV. 1035, 1035-36 (2014-15); Emily Bazelon, *Shaken-Baby Syndrome Faces New Questions in Court*, N.Y. TIMES (Feb. 2, 2011), http://www.nytimes.com/2011/02/06/magazine/06baby-t.html.

*In re Pers. Restraint Petition of Heidi Charlene Fero*, No. 92975-1

condition, and perhaps the infant was injured outside Fero's care.[9] In support,

Fero's declarations offer many equivocal conclusions.[10] *See, e.g.*, Ophoven Decl.

at 3 ("it is *more likely*" that Brynn suffered her injuries 12-24 hours before she was

hospitalized (emphasis added)), 9 (her injuries "are consistent with the injuries that

*could* occur from a short (less than 3 foot) fall" (emphasis added)); Barnes Decl. at

31 (it is "*possible*" that the injuries were inflicted early in the day of January 7,

2002 (emphasis added)). While evidence based on *might* and *perhaps* is sufficient

to possibly change the result at trial, it is far too remote and speculative to prove

the result would probably be different. *In re Pers. Restraint of Wheeler*, 183

Wn.2d 71, 82, 349 P.3d 820 (2015) (citing *Williams*, 96 Wn.2d at 222-23).

---

[9] The dissent emphasizes the possibility that Kaed injured his sister prior to arriving at Fero's home due, in part, to Brynn's many injuries and Kaed's "pattern of assaults." Dissent (Gordon McCloud, J.) at 21-22. The dissent offers no evidence of a specific injury caused by Kaed that caused or contributed to untreated head trauma. The evidence presented indicates only that Kaed had possibly hurt his sister in the past. This does not demonstrate a particular fact that if true would entitle Fero to relief. *In re Rice*, 118 Wn.2d at 886. Such particularized evidence is necessary on collateral review. *Id.* (bald assertions and conclusory allegations are insufficient to warrant relief).

[10] Dr. Ophoven states that the "[f]indings in the case that I believe are very important to the forensic analysis include: a. History that Brynn was irritable, less active and had trouble walking when she arrived to Heidi's residence on January 7, 2002. . . . b. Several bruises were noted at bath time." Ophoven Decl. at 14. Notably, these "findings" appear to be based on conflicting testimony before the court. While Fero and Goodwin testified that Brynn was carried into their home by her mother, cried whenever her leg was touched, and appeared distant throughout the night, Brynn's parents testified that the little girl had been running around while in their care and that her mother did not carry Brynn into Fero's home. Fero's daughter, Rachel, told investigators Brynn had been running and playing while in Fero's care. These "facts" referenced by Dr. Ophoven conflict with the testimony offered at trial and do not constitute "findings."

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fero's lucidity and alternative cause evidence is insufficient to probably change the result at trial, thus her collateral challenge does not fall within the newly discovered evidence exception and the one-year time bar precludes any relief.[11] *Id.*; RCW 10.73.100(1); *In re Adams*, 178 Wn.2d at 422. Therefore, Fero's petition is dismissed.

---

[11] Because Fero did not demonstrate that the evidence presented in Drs. Barnes's and Ophoven's declarations would probably have changed the result at trial, we do not opine on whether Fero satisfies the additional requirements of newly discovered evidence. *Williams*, 96 Wn.2d at 222-23. Nevertheless, we note that Fero does not appear to establish the lucidity and alternative causes evidence is "not merely . . . impeaching" under *Williams*, and thus constitutes an additional ground to dismiss Fero's petition. *Id.* New evidence is "merely impeaching" if it serves only to discredit previously presented evidence at trial and the possibility of some impeachment value does not satisfy the "not merely . . . impeaching" standard. In addition, we decline to address whether recent research on shaken baby syndrome constitutes a debate in the scientific and medical communities, whether the potential debate constitutes newly discovered evidence, or whether the evidence supporting shaken baby syndrome is still valid. We leave these issues for another day's discussion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

González, J.

WE CONCUR:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92975-1

YU, J. (concurring) — I concur in the well-reasoned and thoughtful lead opinion of Justice González and write separately only to express my dismay at the result-driven dissent of Justice Gordon McCloud. The alleged "newly discovered evidence" in this case does not reflect any actual advancement in the medical community, and even if it did, it is unreasonable to claim that this evidence "will probably change the result of the trial." *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). Heidi Charlene Fero is not entitled to relief or a reference hearing on her personal restraint petition.

First, the dissent points to an alleged "paradigm shift in the medical community" that does not exist. Dissent (Gordon McCloud, J.) at 2. The attacks on abusive head trauma or shaken baby syndrome are just a concerted effort to minimize the harm when force is directly applied to an infant's head. According to the American Academy of Pediatrics, "[t]here is no legitimate medical debate among the majority of practicing physicians as to the existence or validity of

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

[shaken baby syndrome]. The only real debate and controversy appear to be in the

legal system and the media." Pet. for Review, App. B, Ex. 1, at 3 (AM. ACAD. OF

PEDIATRICS, UNDERSTANDING ABUSIVE HEAD TRAUMA IN INFANTS AND CHILDREN:

ANSWERS FROM AMERICA'S PEDIATRICIANS (2015)). Because there is no genuine

factual dispute about any alleged paradigm shift in the medical community, Fero is

not entitled to a reference hearing on that issue. *See* dissent (Gordon McCloud, J.)

at 30.

Second, even if Fero were presenting legitimate new medical evidence,

which she is not, that evidence cannot possibly be viewed as likely to change the

result of her trial. Fero's theory of the case has always been that someone else

must have caused the child's extensive physical injuries, such as the child's five-

year-old brother or some adult who assaulted the victim long before she got to

Fero's house. After a full trial with competent counsel, the jury did not believe

her, and for good reason. Regardless of any alleged newly discovered evidence, no

one could look at the photographs depicting the child's physical injuries in this

case and entertain a reasonable doubt as to Fero's guilt based on the theory that

"someone else did it." The photographs have been sealed so the public will never

see the child's horrific injuries, but there is no question that she suffered

inconceivable trauma, and there is no way that the massive bruises covering her

body were inflicted by a five-year-old, or developed over time as the result of

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

preexisting injuries. It is simply beyond *credibility and inconsistent with the proffered testimony*.

Unfortunately, this court is unable to come to a holding on this important issue and instead allows an erroneous Court of Appeals decision reversing Fero's conviction to stand. Our fractured opinion provides no clarity on what qualifies as new scientific or medical evidence that is generally accepted in the relevant scientific community for the purposes of sustaining a collateral attack.

I therefore respectfully concur in Justice González's lead opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero*, No. 92975-1
(Yu, J., concurring)

_Yu, J._

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Personal Restraint of Fero (Heidi Charlene)*
(Stephens, J., concurring in part and dissenting in part)

92975-1

STEPHENS, J. (concurring in part, dissenting in part)—I join Part I of the lead opinion regarding the timeliness of the State's motion for discretionary review. On the merits of the petition, I join Justice Gordon McCloud's dissenting opinion remanding for a reference hearing.

*In re Pers. Restraint of Fero (Heidi C.)*

No. 92975-1

MADSEN, J. (dissenting)—I disagree with the lead opinion's holding that the State of Washington timely filed its motion for discretionary review. In order to be considered timely, the State's motion must have been filed no later than 30 days after January 5, 2016. The State filed its motion on April 1, 2016, clearly in excess of the 30 day limitation. Accordingly, I would hold that the State's motion for discretionary review was untimely. Because I find that the State's motion was untimely, I do not address the other issues raised in this case.

RAP 13.5(a) governs the procedure for discretionary review of a personal restraint petition (PRP). RAP 16.14(c); RAP 13.5A(c). Specifically, RAP 13.5(a) states:

> A party seeking review by the Supreme Court of an interlocutory decision of the Court of Appeals must file a motion for discretionary review in the Supreme Court and a copy in the Court of Appeals within 30 days after the decision is filed.

The rule is clear—a party has 30 days from the time an interlocutory decision is filed to file a motion for discretionary review. Here, the Court of Appeals granted Heidi Fero's PRP on January 5, 2016. A timely motion under RAP 13.5(a) would have been no later than 30 days after the date of that decision. However, the State subsequently filed a

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92975-1
Madsen, J., dissenting

motion for reconsideration, and, incorrectly believing that its motion for reconsideration tolled the filing period, the State did not file a motion for discretionary review until April 1, 2016.

The lead opinion does not dispute the State's noncompliance with RAP 13.5(a) but, rather, holds that the court may waive the timeliness requirement under RAP 1.2.[1] According to RAP 1.2(a), the "rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits." However, this rule is subject to the restrictions in RAP 18.8(b), which directly deals with the failure to timely perfect an appeal. RAP 18.8(b) states:

> The appellate court will only in *extraordinary circumstances and to prevent a gross miscarriage of justice* extend the time within which a party must file a notice of appeal, a notice for discretionary review, a motion for discretionary review of a decision of the Court of Appeals, a petition for review, or a motion for reconsideration.

---

[1] The lead opinion asserts that by invoking RAP 1.2 it did not thereby waive the RAP 13.5(a) timely filing requirements. That is incorrect. The lead opinion unmistakably waived the RAP 13.5(a) timely filing requirements and, in doing so, relied solely on RAP 1.2. Specifically, the lead opinion notes:
> RAP 1.2(a) is of critical importance. This rule governs our interpretation of the Rules of Appellate Procedure . . . .
> RAP 1.2(c) provides that "[t]he appellate court may waive or alter the provisions of any of these rules in order to serve the ends of justice, subject to the restrictions in rule 18.8(b) and (c)." In light of RAP 1.2(a)'s directive to construe our rules "liberally" and not to dismiss a case solely on the basis of "noncompliance" with these rules, . . . [s]uch a summary dismissal would not be in keeping with RAP 1.2(a).
Lead opinion at 14-15. Indeed, if the lead opinion is not invoking RAP 1.2 to waive the RAP 13.5(a) timely filing requirements, it is unclear on which basis the lead opinion relies in circumventing RAP 13.5(a).

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92975-1
Madsen, J., dissenting

(Emphasis added); *see Beckman v. Dep't of Soc. & Health Servs.*, 102 Wn. App. 687, 693, 11 P.3d 313 (2000) ("RAP 18.8 expressly requires a narrow application"). The lead opinion is unfazed by this limitation, holding that allowing the case to move forward serves the ends of justice because a strict interpretation of "decision" in RAP 13.5(a) is "unnecessarily rigid" and it is possible that the State would be required to file its motion for discretionary review before the Court of Appeals ruled on its motion for reconsideration.

While this court promulgates the court rules, we approach them "as though they had been drafted by the Legislature" and interpret the rules using principles of statutory construction. *State v. Greenwood*, 120 Wn.2d 585, 592, 845 P.2d 971 (1993). To that end,

> [t]he intent to overturn settled principles of law will therefore not be presumed unless:
> an intention to do so plainly appears by *express declaration* or *necessary or unmistakable implication*, and the language employed in the [court rules] admits of no other reasonable construction.

*Id.* at 593 (quoting *Ashenbrenner v. Dep't of Labor & Indus.*, 62 Wn.2d 22, 26, 380 P.2d 730 (1963)). Although the majority has concerns with the application of our court rules, those concerns should be addressed "through the normal rule-making process." *In re Pers. Restraint of Carlstad*, 150 Wn.2d 583, 592 n.4, 80 P.3d 587 (2003). However, "[f]oisting [an unfounded interpretation of the court rules] upon courts and parties by judicial fiat could lead to unforeseen consequences." *Id.*

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92975-1
Madsen, J., dissenting

Here, the State's failure to timely file its motion was neither the product of extraordinary circumstances nor a gross miscarriage of justice. An extraordinary circumstance includes "instances where the filing, despite reasonable diligence, was defective due to excusable error or circumstances beyond the party's control." *Shumway v. Payne*, 136 Wn.2d 383, 395, 964 P.2d 349 (1998) (citing *Hoirup v. Empire Airways, Inc.*, 69 Wn. App. 479, 482, 848 P.2d 1337 (1993); *Reichelt v. Raymark Indus., Inc.*, 52 Wn. App. 763, 765, 764 P.2d 653 (1988)). For example, this court has held that the RAP 18.8(b) standard was met and granted an extension of time where a pro se litigant misinterpreted the RAP. *See Scannell v. State*, 128 Wn.2d 829, 835, 912 P.2d 489 (1996).

However, this case does not deal with a pro se litigant but, rather, the State. I am unpersuaded that the State, in exercising reasonable diligence, is incapable of understanding and adhering to the clear mandate set forth in RAP 13.5(a). Finally, if justice is served by allowing the State, perhaps the most sophisticated and experienced litigant to appear in this court, to circumvent the plain text of RAP 13.5(a), it is unclear as to whom this rule could possibly apply.

Because the State's motion was untimely under RAP 13.5(a), and RAP 18.8(b) does not apply, I would decline to review the decision below. Accordingly, I respectfully dissent.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 92975-1
Madsen, J., dissenting

_Madsen, J._

_Wiggins, J._

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

No. 92975-1

GORDON McCLOUD, J. (dissenting)—Petitioner Heidi Fero presents new scientific evidence that devastates the State's entire shaken baby theory.

Fero's 2003 jury convicted her of first degree child abuse because an overwhelming number of state medical experts all confirmed to a reasonable degree of medical certainty that Fero must have been guilty of child abuse. Those experts came to this conclusion because, in their opinion, the child's injuries could have been inflicted only by an adult, only intentionally, and only during the time period when Fero was the sole adult present. Fero did not even try to rebut this testimony at trial with her own experts because those experts testified in accordance with the prevailing medical opinion at the time.

But that opinion, Fero claims, has shifted dramatically in response to recent advances in medical technology and new scientific studies. These new studies show that the child's injuries could have been inflicted accidentally, could have been inflicted by another child, and were probably inflicted before the child arrived at

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

Fero's home. Fero contends that these new scientific conclusions are so dramatically different from the old shaken baby syndrome understanding as to constitute a paradigm shift in the medical community. This evidence (based as it is on recent scientific research and studies) is clearly new, could not have been discovered before trial, and would probably change the result of trial. Fero is entitled to an opportunity to prove both of her critical factual claims—that the studies credibly demonstrate a paradigm shift and that she exercised reasonable diligence. If those new scientific studies and paradigm shift claims are credible and if Fero was reasonably diligent in discovering them and filing her petition, then she is entitled to a new trial.

I therefore respectfully dissent.[1]

---

[1] On the threshold timeliness issue, I agree with the lead opinion that we should accept the State's motion for review, but I disagree with the lead opinion's underlying conclusion that the State's motion was timely. Lead opinion at 16. The lead opinion acknowledges the State's motion was *un*timely under a literal application of RAP 13.5(a). It must do so, because that rule states that "[a] party seeking review . . . must file for discretionary review . . . within 30 days after the decision is filed." The lead opinion, however, chooses a nonliteral reading of the rule that begins counting the 30 days for filing from entry of the decision on reconsideration, rather than entry of the decision itself.

Untimeliness, however, does not preclude us from considering the State's motion. RAP 18.8(b) authorizes us to excuse a missed filing deadline "in extraordinary circumstances and to prevent a gross miscarriage of justice." Although RAP 18.8(b) sets a high standard, that standard has been met in this case where the State did not realize RAP 13.5(a) required that it file its motion for discretionary review within 30 days of the Court of Appeals' decision regardless of whether a motion for reconsideration was pending.

2

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

RELEVANT FACTS

On January 7, 2002, Heidi Fero agreed to watch 15-month-old Brynn and 4 ½-year-old Kaed while their parents, Breann Franck and Jason Ackley,[2] were at work. Franck dropped the children off that afternoon at Fero's home around 2:00 p.m. 1 Verbatim Report of Proceedings (VRP) (Mar. 11, 2003) at 152. Because Fero was not home at the time, Franck left the children with Fero's fiancé. *Id.* After Fero arrived, her fiancé left for work. 1 VRP (Mar. 12, 2003) at 157-58. That left Fero home alone with Brynn, Kaed, and her own two young children, Rachel and Derrick, from that point until paramedics arrived at about 10:00 p.m. to transport Brynn to the hospital. *Id.* at 154; Excerpted VRP (Mar. 10, 2003) at 37. When those paramedics arrived, Brynn was visibly limp and unconscious. She had bruises on her forehead, chin, and pelvic area; a fractured left tibia; and dried blood in her mouth. Additional hospital scans showed retinal hemorrhaging, brain bleeding, and brain swelling.

Fero claims she did not cause any of these injuries. At trial, Fero's testimony suggested that Brynn was probably somewhat injured before she arrived and that

_____

[2] Ackley is Brynn's biological father but not Kaed's. 1 Verbatim Report of Proceedings (Mar. 11, 2003) 124-25.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Kaed likely aggravated those preexisting injuries at Fero's home when he climbed into Brynn's playpen, banged her head against the wall, and lifted her leg to her chin while pretending to be an action hero fighting monsters.

A.    *Fero's Evidence at Trial*

Fero testified that she noticed early that evening that Brynn was not walking around the house like she normally would, but Fero did not think much of it at the time. 5A VRP (Mar. 17, 2003) at 75. Fero explained that she watched Brynn occasionally while her parents were at work, *id.* at 69-70, so Brynn had bonded with her and would follow her around the house, *id.* at 75. But on that day, Brynn stayed mostly wherever Fero placed her. *Id.* Fero dismissed Brynn's unusual behavior, however, believing Brynn was acting distant because she had not seen Fero for three weeks. *See id.* at 73, 75.

Fero also testified that she saw an enormous bruise on Brynn's pelvic area early that evening. Fero testified that she first noticed that large bruise below Brynn's belly button, near her pelvis, while she was bathing Brynn. *Id.* at 76. Although the bruise "disturbed [her]" and made her feel sick when she saw it, she ultimately dismissed it since Brynn often had bruises on her body. *Id.* at 76-77. Brynn's father confirmed that Brynn often had bruises because she was a "pretty

clumsy" toddler and her older brother, Kaed, had a tendency to pinch and play too roughly with her. *See* 1 VRP (Mar. 11, 2003) at 142, 127-30. This is why Fero did not call Brynn's father right away.

Fero testified that after she finished bathing Brynn, she dressed her, brought her downstairs, and placed her in her playpen. 5A VRP (Mar. 17, 2003) at 77. Fero then proceeded to bathe her son, Derrick. *Id.* at 78. While Fero was upstairs bathing Derrick, her five-year-old daughter, Rachel, came in and reported that Kaed was hurting Brynn. *Id.* at 80. Fero immediately stopped bathing Derrick, placed him in his crib, and went downstairs to investigate. *Id.* at 80-81. She found Kaed on the couch and Brynn in her playpen. *Id.* at 81. Fero checked on Brynn; she looked fine so Fero went back upstairs to finish drying and dressing Derrick. *Id.*

While Fero was upstairs, Rachel appeared a second time. *Id.* This time, Fero recalled Rachel specifically saying that Kaed was banging his sister's head against the wall. *Id.* Rachel mostly confirmed Fero's recollection but said she saw Kaed pushing rather than banging Brynn against the wall. *Id.* at 43-44. Rachel added that she also saw Kaed hitting Brynn with a toy hammer and toy wooden cane and lifting Brynn's leg to her chin. *Id.* at 43, 49.

5

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

When Fero went downstairs this second time to investigate, she caught Kaed climbing out of Brynn's playpen. *Id.* at 82. Although Fero did not catch Kaed in the act, Fero believed Kaed probably hurt his sister because Brynn was crying. *Id.* at 82-83. Brynn's cries, however, seemed unusual and silent, and she was shaking and trembling "more than [Fero had] seen a child do before." *Id.* at 82. Fero picked Brynn up and noticed a small amount of blood in Brynn's mouth. *Id.* Fero asked Kaed to explain what he had done to his little sister, but Kaed responded only that he was a "Power Ranger" action hero. *Id.* at 83. Although Kaed never described what he did to Brynn, he later admitted to the responding police officers that he caused his sister to stop breathing, though he also believed there was blood in Brynn's mouth because "the temperature just push[ed] it out" or her "[d]reams push[ed] it out." 2 VRP (Mar. 12, 2003) at 212-13.

Fero testified that she knew at that time that Brynn was hurt, but believed Brynn would be "okay," 5A VRP (Mar. 17, 2003) at 87, because Brynn had only a few red marks forming on her face, 5B VRP (Mar. 17, 2003) at 122. Fero therefore focused on soothing Brynn by rocking her until her eyes closed and her body "just kind of relaxed all of a sudden." 5A VRP (Mar. 17, 2003) at 84. Believing Brynn had fallen asleep, Fero laid her down carefully against the back dip of her futon so

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

Brynn would not accidentally roll off and then called Brynn's and Kaed's father. *Id.* at 84-85. That call occurred around 7:45 p.m. *Id.* at 86.

The father, Ackley, confirmed that Fero called him that evening while he was at work and told him that Rachel saw Kaed push Brynn's head against a wall. 1 VRP (Mar. 11, 2003) at 118-19. Ackley also confirmed that Fero told him that Brynn was unable to walk on one leg. *Id.* In contrast to Fero's testimony, however, Ackley did not recall Fero mentioning blood in Brynn's mouth or bruises on her pelvis. *Id.* at 119-20. Ackley acknowledged the focus of his conversation with Fero was on disciplining Kaed for hurting his sister, *id.* at 120, rather than on identifying Brynn's precise injuries. The call ended with Ackley suggesting that Fero lock Kaed in a closet or bedroom. 5A VRP (Mar. 17, 2003) at 86. It is unclear whether Fero disciplined Kaed that night as Ackley suggested.

Sometime after the call ended, Fero turned on a movie to occupy Kaed and Rachel while she cleaned her house. *Id.* at 87-88. Fero testified that she checked on the children every few minutes while she was cleaning. *Id.* at 88, 93.

But a couple of hours later, around 9:45 p.m., when Fero was swapping in a new movie for the children, Fero noticed that Brynn's eyes were partially open and "something didn't look right." *Id.* at 88. Fero tried to wake Brynn by "wiggling her

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

chest and saying her name" and then splashing water on her face, but Brynn did not respond. *Id.* at 89. It was at this moment that Fero noticed dark bruises had formed on Brynn's face. 5B VRP (Mar. 17, 2003) at 118. Fero immediately called her mother, who had some medical training, for advice. Her mother told her to call 911. Cell phone records show that Fero called her mother at 9:52 p.m. and called 911 two minutes later. 5A VRP (Mar. 17, 2003) at 90.[3]

Fero explained to the paramedics and responding officers that Kaed might have been responsible for Brynn's injuries. Excerpted VRP (Mar. 10, 2003) at 41

---

[3] Fero's statements to the responding officers and emergency personnel conflicted with her trial testimony in four ways. First, Fero told the 911 operator that Kaed was "'chasing'" his sister that night, 5A VRP (Mar. 17, 2003) at 98, which implied Brynn had been running even though Fero testified that Brynn was mostly sedentary that evening, *id.* at 75. Second, Fero told responding officers that she did not bathe Brynn that day, 2 VRP (Mar. 12, 2003) at 193, even though she testified that she first noticed the bruise on Brynn's pelvic area while she was bathing Brynn, 5A VRP (Mar. 17, 2003) at 76-77. Third, Fero told the detectives that Brynn's playpen was originally located against the wall but had been recently moved even though there were no carpet indentations showing the playpen had been moved. 1 VRP (Mar. 11, 2003) at 66. Fourth, Fero signed a statement stating only "a few minutes" had elapsed between her seeing Kaed climb out of Brynn's playpen and her finding Brynn unconscious on the futon, 5A VRP (Mar. 17, 2003) at 102-03, even though she testified at trial that approximately two hours had elapsed in between, *id.* at 88, 93. But Fero contested the accuracy of the signed statement. According to Fero, she told the officers that she was checking on the children every five minutes during the two hours she was cleaning. *Id.* at 92-93. Notably, Captain Mitch Nelson of the fire department was present during the police interview and confirmed Fero's story. According to Captain Nelson, Fero reported that night—consistent with her trial testimony—that Brynn was sleeping for hours. 1 VRP (Mar. 11, 2003) at 101-02.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(Dohman); 1 VRP (Mar. 11, 2003) at 20 (same), 40 (Tone), 62 (Smith), 84-88 (Telford), 101-02 (Nelson); 2 VRP (Mar. 11, 2003) at 190-91 (Dr. Lukschu), 195-97 (Norton).

Even Kaed's mother, Franck, believed Kaed was likely responsible for Brynn's injuries. 1 VRP (Mar 11, 2003) at 164. According to Franck, Kaed was mean to his baby sister. *Id.* at 154-56. Franck had seen Kaed kicking Brynn and once even saw him land on top of her while trying to jump over her. *Id.* at 161-63.

Brynn's father, Ackley, confirmed that Kaed had problems with anger and violence, *id.* at 28, and believed Kaed may have been jealous of the attention his little sister received, *id.* at 130. Ackley himself had seen Kaed pushing and pinching Brynn and once even saw Kaed pull Brynn's legs out from under her. *Id.* at 128. This aggression, Ackley explained, had worsened in the months preceding the night at Fero's home. *Id.* at 130.

### B.  The State's Shaken Baby Theory

The State rejected Fero's theory that Kaed caused Brynn's leg and head injuries. So did the jury. That was probably because the State presented expert testimony from six medical professionals all opining to a reasonable degree of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

medical certainty that Kaed lacked the strength to exert the magnitude of force necessary to cause Brynn's head injuries.

The State's experts acknowledged that Kaed could have caused the bruises on Brynn's face and pelvic area by jumping on her or hitting her with a toy hammer or a wooden cane, 2 VRP (Mar. 11, 2003) at 204-06, 218-19 (Dr. Lukschu), and could have fractured her leg by tackling or knocking her down, VRP (Mar. 13, 2003) at 26 (Dr. Bennett). But those activities, the experts testified, could not explain Brynn's head injuries.

Specifically, the State's experts testified that it was physically impossible for Kaed to cause Brynn's head injuries. *Id.* at 34-35 (Dr. Bennett); 2 VRP (Mar. 11, 2003) at 196, 200 (Dr. Lukschu); 1 VRP (Mar. 12, 2003) at 64, 72 (Dr. Gorecki). According to these experts, a substantial amount of force—equivalent to the force involved in an automobile accident or a fall from a multistory building—was needed to produce retinal hemorrhaging, brain bleeding, and brain swelling in a child. *See id.* at 84, 96 (Dr. Ockner); VRP (Mar. 13, 2003) at 50 (Dr. Grewe), 63, 75 (Dr. Goodman). This ruled out Kaed as a possible suspect since a four-and-a-half-year-old could not produce such substantial force.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The State's experts also ruled out all other adults as potential suspects. Those experts opined that, given the amount of force needed to cause Brynn's head injuries, Brynn would have lost consciousness either immediately, 2 VRP (Mar. 11, 2003) at 195, 229 (Dr. Lukschu); 1 VRP (Mar. 12, 2003) at 97 (Dr. Ockner), 74 (Dr. Gorecki), or at least within 2 or 5 hours after injury, 70 (Dr. Gorecki) (2 hours); VRP (Mar. 13, 2003) at 28 (Dr. Bennett) (5 hours). This expert testimony left Fero as the only possible suspect because she was the only adult with Brynn for over six hours from 3:30 p.m. to 9:45 p.m.

Based on this expert testimony, the State theorized that Fero—a normally loving caregiver—became so frustrated with Brynn while she was giving her a bath around 7:00 p.m. that she beat the toddler, twisted her leg until it fractured, and later around 9:45 p.m. when Brynn would not stop fussing over her injured leg, violently shook Brynn into immediate unconsciousness. 5B VRP (Mar. 17, 2003) at 160, 162-63. The State advanced this theory despite testimony from Brynn's parents describing Fero as a great mom, proclaiming how glad they were to have her as a babysitter, and confirming how they never saw her "lose her cool" with any children, including their daughter, Brynn. *See* 1 VRP (Mar. 11, 2003) at 131, 160.

11

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

Since there was no eyewitness testimony to support the State's shaken baby theory, the jury must have convicted Fero based on the strength of the State's six expert witnesses. Those experts overwhelmingly confirmed that the force necessary to produce Brynn's head injuries had to have been inflicted intentionally, by an adult, and during the period when Fero was the only adult present.[4]

C.      *Fero's Newly Discovered Evidence*

Fero's new evidence undermines that expert testimony. Fero's two postconviction experts, Dr. Patrick Barnes and Dr. Janice Ophoven, describe new scientific studies and medical research that they believe prove the State's shaken baby theory was wrong and show that Fero is probably innocent. According to Fero's postconviction experts, these new studies and this new research disprove two critical assumptions underlying the State's shaken baby theory: (1) that a substantial amount of force was required to produce Brynn's head injuries and (2) that this force would have been so violent that Brynn's injuries would probably have manifested immediately with no intervening period of lucidity.

---

[4] The State also suggested that Fero might have swung Brynn into a wall like a baseball bat, 5B VRP (Mar. 17, 2003) at 154, but it is unlikely the jury believed this. This theory was completely refuted by the State's own experts who said it was impossible for Brynn's head injuries to have been caused by blunt force impact without cracking her skull or shattering her facial bones, neither of which occurred. 2 VRP (Mar. 11, 2003) at 224-25 (Dr. Lukschu); VRP (Mar. 13, 2003) at 46, 48 (Dr. Grewe), 34 (Dr. Bennett).

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

Dr. Barnes is a pediatric neuroradiologist with 35 years of practice and teaching experience. Barnes Decl. at 1 (included as an exhibit in Opening Br. in Supp. of Pers. Restraint Pet.). He is an expert in diagnosing possible child abuse. *Id.* at 1-2. Dr. Barnes explains that until about 2004 (the year after Fero's trial), he and virtually everyone else in the medical community—including the State's experts—believed that retinal hemorrhages, brain bleeding, and brain swelling were conclusive signs of child abuse by intentional shaking even though there was no scientific evidence to support that diagnosis. *Id.* at 4-8. That theory, Dr. Barnes explains, has since been refuted by actual scientific evidence. *Id.* at 5-6. For that reason, Dr. Barnes concludes, the State's theories on those points are no longer regarded as credible by many doctors in the medical community. *Id.*

In fact, according to Dr. Barnes, research in biomechanics, neuropathology, and ophthalmology, coupled with advances in MRI (magnetic resonance imaging) technology over the past decade, have led medical experts to believe that subdural and retinal hemorrhages can be caused by far less force than previously assumed. *Id.* at 10-19. Indeed, one study shows that even "a relatively small impact following an unresolved head injury occurring days to weeks previously" could cause subdural hemorrhaging in a child. *Id.* at 19 (citing R. Cantu & A. Gean, *Second-Impact*

13

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

*Syndrome and a Small Subdural Hematoma: An Uncommon Catastrophic Result of Repetitive Head Injury with a Characteristic Imaging Appearance*, 27 J. NEUROTRAUMA 2557 (2010)).

Fero's other expert is Dr. Ophoven, a specialist in anatomic and forensic pathology and an expert in shaken baby syndrome. Ophoven Decl. at 1 (included as an exhibit in Opening Br. in Supp. of Pers. Restraint Pet.). Dr. Ophoven agrees with Dr. Barnes that "new medical evidence . . . directly contradicts the positions of the prosecution's experts at trial" and explains that this new evidence is so compelling that the positions taken by the State's experts at trial "are no longer generally accepted within the medical community." *Id.* at 11. According to Dr. Ophoven, most experts now accept that "a broad range of phenomena, including accidental falls from a very short height, could cause injuries like Brynn's." *Id.* at 4. And because the force required to cause such injuries is far less than previously assumed, "[a] child is more than capable of causing such injuries." *Id.*

If Dr. Barnes and Dr. Ophoven are correct, these studies would have changed everything about Fero's trial. These studies show that Brynn's injuries could have been caused accidentally by Kaed's aggressive play. They also establish to a reasonable degree of medical certainty that Brynn's injuries were probably inflicted

14

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

before Brynn arrived at Fero's home and were only aggravated later that night by Kaed when he climbed into Brynn's playpen and banged her head against the wall. Ophoven Decl. at 3, 9-10; Barnes Decl. at 26-27. Thus, this new evidence, if true, completely undermines the State's theory that Fero was the only person who could have hurt Brynn and shows that there are at least four others who could have harmed her: the brother, Kaed; the father, Ackley; the mother, Franck; and Fero's fiancé, who was home with Brynn when she was first dropped off.

ANALYSIS

To obtain a new trial based on newly discovered evidence, Fero has to prove "'the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.'" *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001) (quoting *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)). Additionally, because Fero filed her personal restraint petition after the one-year period for collateral attacks under RCW 10.73.090 had expired, Fero must also prove that she "'acted with reasonable diligence in discovering the [new] evidence and filing the petition.'" *In*

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*re Pers. Restraint of Stenson*, 174 Wn.2d 474, 485, 276 P.3d 286 (2012) (quoting RCW 10.73.100(1)).

Fero claims her evidence meets this standard. She argues that because the majority of the medical community did not question the underlying assumptions of the State's shaken baby theory until after her trial was over, her evidence is obviously new and clearly could not have been discovered before trial. Opening Br. in Supp. of Pers. Restraint Pet. at 42-43. Fero also argues that this evidence, if believed, is material and would probably change the result of trial because the evidence completely undermines the State's entire shaken baby theory. For this reason, Fero concludes that she is entitled to a new trial without a need for a reference hearing. She says no reference hearing is warranted because the State offered no opposing evidence. Suppl. Br. of Resp't Heidi Charlene Fero at 12-16; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886-87, 828 P.2d 1086 (1992) (holding no reference hearing is necessary if the State does not challenge the petitioner's prima facie evidence of prejudice).

But the State did offer opposing evidence. The State challenged the newness of Fero's evidence and the credibility of her claim of a recent paradigm shift. *See infra*, Section D.1. Alternatively, the State argues that Fero's declarations are

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

immaterial and would not have made a difference at trial because they do not account for all of Brynn's injuries—specifically her leg injury. Suppl. Br. of Pet'r at 19-22. Finally, the State asserts that Fero is not entitled to a new trial because her petition is tardy. *Id.* at 16-17. At most, the State concedes that Fero might be entitled to a reference hearing to evaluate the credibility of her expert declarations and the circumstances surrounding her delayed filing. *Id.* at 24-28.

As discussed below, no one has tested the credibility of Fero's experts or determined the timeliness of her petition given the new "paradigm shift" on which she relies. I therefore agree with the State's (alternative) position that Fero has presented sufficient evidence to warrant a reference hearing under RAP 16.11 and 16.12, and *Rice*, 118 Wn.2d at 886-87.

A. *Fero's Postconviction Evidence Undermines the State's Shaken Baby Theory—If It Is Believed, It Is Material and Would Probably Change the Result of the Trial*

Fero's postconviction evidence, if true, devastates the State's entire shaken baby theory. The State attempts to sidestep that fact. It argues that no matter how persuasive Fero's new evidence may be at proving she did not cause Brynn's head injuries, her evidence would not have made a difference at trial because it does not

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

explain Brynn's displaced leg fracture. Suppl. Br. of Pet'r at 19-22. The lead opinion agrees with the State. Lead opinion at 26.

The State, however, charged Fero with first degree assault of a child. A leg fracture is not enough to convict Fero of that crime. To convict Fero of that crime, the State had to prove that Fero intentionally assaulted Brynn and recklessly inflicted "great bodily harm" on her. RCW 9A.36.120(b)(i); 5B VRP (Mar. 17, 2003) at 142. "'Great bodily harm' means bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(c). There was no evidence at trial that Brynn's leg fracture was a "permanent" injury or "creat[ed] a probability of death." Indeed, the State conceded that Brynn's leg would heal within a couple of months. 5B VRP (Mar. 17, 2003) at 143. Thus, even if the lead opinion were correct that a reasonable jury more probably than not would still have found beyond a reasonable doubt that Fero (a person whom everyone regarded as a wonderful mother and caregiver) intentionally assaulted Brynn (a child who was bonded with her) with force sufficient to cause her leg to fracture, a leg fracture alone would not have been sufficient to support Fero's conviction. The State's and the lead opinion's argument

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that the leg fracture alone supports Fero's conviction and that her new evidence would not have changed the outcome at trial therefore fails.

We must therefore consider the main focus of the State's case at trial, that is, Brynn's head injuries. Fero's postconviction experts say that Fero could not have caused (per one expert), or probably did not cause (per her other expert), those head injuries, given the amount of time it takes for such head injuries to manifest. According to Dr. Ophoven, "brain swelling following serious brain damage peaks at 48 to 72 hours." Ophoven Decl. at 13. Because "Brynn already had significant brain swelling by the time she arrived at [the hospital]," *id.*, Dr. Ophoven was able to "conclude[], to a reasonable degree of medical certainty, that Brynn was injured at least 12 hours before her first CT [(computed tomography)] scan, which would have been before Brynn was dropped off at Heidi Fero's house," *id.* at 10. Dr. Barnes similarly concludes that "there is a significant chance that [Brynn] was injured before she arrived at Ms. Fero's home." Barnes Decl. at 26-27.

The lead opinion cautions against giving too much weight to Dr. Ophoven's and Dr. Barnes's declarations because the State's experts already acknowledged at trial that it could have taken some time for Brynn's injuries to manifest. Lead opinion at 20-21. In other words, the lead opinion characterizes Fero's experts'

19

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

opinions as repetitive of the State's experts' opinions at trial on this point. Fero's postconviction evidence is critically different. It establishes through scientific evidence that Brynn probably experienced a prolonged lucid interval before losing consciousness. That means her injuries must have (according to one expert) or may have (according to another expert) occurred *before*, not after, she arrived at Fero's home. That obviously supports Fero's defense that she did not inflict the injuries— someone else did. The State's evidence was completely different. The State's experts testified that Brynn could have remained conscious for *at most* 2 or 5 hours after injury. That meant that Brynn was injured *while* she was in Fero's care. 1 VRP (Mar. 12, 2003) at 70 (Dr. Gorecki) (2 hours); VRP (Mar. 13, 2003) at 28 (Dr. Bennett) (5 hours). The State's experts never said a period of lucidity of days or weeks was possible as Fero's experts do. Barnes Decl. at 19; Ophoven Decl. at 13-14. Nor did the State's experts testify that a period of lucidity of 48 to 72 hours was typical as Dr. Ophoven asserts. Ophoven Decl. at 13. And most crucially, the State's experts never testified to a reasonable degree of medical certainty that Brynn probably experienced at least 12 hours of lucidity from the time she was injured until the time she was admitted into the hospital as Dr. Ophoven says, Ophoven Decl. at 3, 10, or that there was a "significant chance" Brynn was injured before she arrived

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

at Fero's home as Dr. Barnes says, Barnes Decl. at 26-27. If believed, this evidence alone is sufficient to probably change the result of trial.

But Fero's evidence undercuts the State's evidence even more. At trial, the State's experts ruled out Kaed as a possible assailant because he was so small (though they all acknowledged there was no scientific evidence to support that theory). In contrast, Fero's experts say that the newest, most reliable scientific evidence shows that a small child like Kaed could have caused Brynn's injuries. According to Dr. Barnes, one study proves that even a relatively small impact following an unresolved head injury can cause subdural hemorrhaging in a child. *Id.* at 19 (citing Cantu & Gean, *supra*). According to Dr. Ophoven, that means "[a] child is more than capable of causing such injuries." Ophoven Decl. at 4 (citing G.T. Lueder et al., *Perimacular Retinal Folds Simulating Nonaccidental Injury in an Infant*, 124 ARCH. OPHTHALMOLOGY 1782 (2006)).

The lead opinion dismisses these statements because there was no evidence that Brynn had one specific prior head injury. Lead opinion at 22-25. While the lead opinion correctly identifies the lack of one specific head injury, it ignores the unrebutted evidence at trial about the other injuries all over Brynn. That evidence included acknowledgements from Brynn and Kaed's own parents that Kaed

21

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

committed a pattern of assaults against Brynn. The parents testified that Brynn often had bruises on her body because Kaed had a tendency to play too aggressively with her. 1 VRP (Mar. 11, 2003) 154-56, 161-63 (Franck), 128 (Ackley). That pattern of aggressive play included testimony that Kaed constantly pinched her, fell on her while jumping over her, and even pulled her leg out from under her at least once. This aggressive play, Brynn's father explained, only worsened in the months leading up to Brynn's arrival at Fero's home. *Id.* at 130. The lead opinion errs in dismissing the new experts' evidence that a small child could easily have exacerbated a preexisting head injury. In fact, there was overwhelming evidence at trial that Brynn might have had a preexisting head injury that was aggravated by Kaed at Fero's home.

Fero's new evidence thus undermines the State's shaken baby theory, places the time of Brynn's injury outside the period when Fero was home alone with her, and confirms that Kaed, a person known for his violent and aggressive acts toward Brynn, could have caused those injuries. If credible, this new expert evidence would certainly be material and would probably change the result at trial.

22

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

  B.  *Fero Claims There Was a Paradigm Shift in the Medical Community Discrediting the State's Shaken Baby Theory—If Correct, This Is a Shift That Could Not Have Been Discovered with Due Diligence or Reasonable Diligence before Trial*

The lead opinion next observes that Fero would not be entitled to a new trial if her evidence was not new. It continues that the State's own experts acknowledged at trial that Brynn could have remained lucid for a *short* period of time following injury, rather than falling unconscious immediately, so such evidence of a short lucid interval is not new. Lead opinion at 20-21. This is correct. The State's experts specifically acknowledged during trial that Brynn could have been lucid for up to two or five hours following impact. Nor could Fero obtain a new trial based solely on the absence of scientific data to support the State's expert opinions because that inadequacy could have been discovered before trial. *See* VRP (Mar. 13, 2003) at 66-71 (Dr. Goodman acknowledging an ongoing debate in the medical community over whether retinal hemorrhages were really conclusive signs of child abuse since there is no evidence to support that conclusion).

But Fero does not rest her petition solely on these grounds. Instead, Fero identifies a slow avalanche of new scientific data collected over the past decade that has led to a significant shift in the medical community's views on the credibility of shaken baby diagnoses. This new scientific evidence, Fero explains, proves Brynn

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

could have been lucid for days or even weeks following injury, rather than just a few hours. This new evidence also proves that the State's experts' opinions regarding shaken baby diagnoses were wrong, rather than simply unsupported.

According to one of Fero's experts, Dr. Barnes, shaken baby syndrome was a medical hypothesis developed in the 1940s that gained nearly universal acceptance in the medical community by the 1990s, despite the lack of scientific or evidentiary data to support the hypothesis. Barnes Decl. at 4-5. Thus, for years, doctors diagnosed children with shaken baby syndrome based simply on "circular reasoning." *Id.* at 9. "Since the triad (subdural hemorrhage, retinal hemorrhage and brain swelling) was considered to be pathognomonic of child abuse, a child who presented with the triad (or sometimes with a portion of the triad) was automatically classified as 'shaken' or 'abused.'" *Id.* "These diagnoses were then used to validate the theory and to diagnose other 'shaken' or 'abused' children," which only further legitimized the shaken baby theory in the medical community despite "the lack of an evidence base." *Id.* This, Dr. Barnes explains, was the state of medicine when Fero's trial was held. *See id.* at 5-6.

But slowly over the last decade, propelled in part by a community push for more evidence-based medicine, doctors and other medical experts began to question

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the assumptions underlying the shaken baby theory. *Id.* at 6-8. This evidence-based approach led Fero's experts to believe that Brynn was mistakenly diagnosed with shaken baby syndrome. Barnes Decl. at 30; Ophoven Decl. at 9. Specifically, Dr. Barnes based his opinion on recent biomechanical research "confirm[ing] that short falls can cause the findings previously associated with abuse and that shaking would cause serious neck injury before it created subdural hemorrhages" and the fact that Brynn had no such neck injury. Barnes Decl. at 11 (citing J. Plunkett, *Fatal Pediatric Head Injuries Caused by Short-Distance Falls*, 22 AM. J. FORENSIC MED. PATHOLOGY 1 (2001); A.K. Ommaya et al., *Biomechanics and Neuropathology of Adult and Pediatric Head Injury*, 16 BRIT. J. NEUROSURGERY 220 (2002); M.T. Prange et al., *Anthropomorphic Simulations of Falls, Shakes, and Inflicted Impacts in Infants*, 99 J. NEUROSURGERY 143 (2003); W. Goldsmith & J. Plunkett, *A Biomechanical Analysis of the Causes of Traumatic Brain Injury in Infants and Children*, 25 AM J. FORENSIC MED. & PATHOLOGY 89 (2004); F. Bandak, *Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms*, 1521 FORENSIC SCI. INT'L 71 (2005)), 30-31. Instead, Dr. Barnes explains, "increased research into second impact syndrome" now shows that "a relatively small impact following an unresolved head injury occurring days to weeks previously can result in cerebral

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

edema, a small subdural hemorrhage and death." *Id.* at 19 (citing Cantu & Gean, *supra*). Such a smaller impact is consistent with Fero's account of that night.

Finally, according to Fero's new experts, advances in radiology technology have "undercut a basic premise of shaken baby syndrome, which assumed that subdural hemorrhages are immediately symptomatic and that the perpetrator can therefore be identified based on timing." Barnes Decl. at 15; *accord* Ophoven Decl. at 8. But that assumption—which Fero's experts discredit—is the only way the State's experts say they were able to narrow the list of possible assailants to only Fero.

To be sure, Fero's expert, Dr. Barnes, recognizes that "[s]ome of this literature was available before Ms. Fero's trial." Barnes Decl. at 10. However, "it was not widely read or applied by clinicians or child protection teams." *Id.* Thus, "[a]t the time of Ms. Fero's trial, many doctors would have agreed with the doctors for the [S]tate." *Id.* at 31.

Fero therefore describes her new evidence as a paradigm shift in the medical community regarding the credibility of shaken baby diagnoses. She explains that this shift is significant because it now allows her to do what she could not do at trial, that is, to persuasively challenge the State's experts' testimony with data-based

26

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

evidence that their assumptions and opinions "are no longer generally accepted within the medical community." Ophoven Decl. at 11. In other words, "it is the emergence of a legitimate and significant dispute within the medical community as to the cause of . . . injuries [formerly considered definitively symptomatic of shaken baby syndrome] that constitutes newly discovered evidence." *State v. Edmunds*, 2008 WI App 33, 308 Wis. 2d 374, 392, 746 N.W.2d 590.

If Fero's experts are believed, this paradigm shift also undermines the State's experts' testimony. In addition, if Fero's experts are believed, this paradigm shift had not yet occurred at the time of her trial and therefore could not have been discovered before trial through the exercise of due diligence or reasonable diligence. Barnes Decl. at 31; Ophoven Decl. at 5.

## C.    *Fero's Evidence Is Substantive, Not Merely Impeaching*

The only other thing that Fero needs to prove to gain a new trial is that her new, material, outcome-determinative evidence is more than "'merely cumulative or impeaching.'" *Brown*, 143 Wn.2d at 453 (quoting *Williams*, 96 Wn.2d at 223).

"Impeachment evidence" refers to "[e]vidence used to undermine a witness's credibility." BLACK'S LAW DICTIONARY 676 (10th ed. 2014). Impeachment evidence typically tests a witness's ability to perceive or recall matters, highlights

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

defects in a witness's character, or underscores a bias that may lead the witness to distort his or her testimony, either consciously or unconsciously. ROGER PARK & TIM LININGER, THE NEW WIGMORE: A TREATISE ON EVIDENCE: IMPEACHMENT AND REHABILITATION § 2.1, at 65 (2012). Substantive evidence conveying a different story or reaching a different conclusion is not impeachment evidence because it does not directly attack a witness's credibility. *See id.* § 2.1.5. Thus, even though alternative expert conclusions undermine the credibility of an opposing witness's opinions, such evidence does not belong under the traditional rubric of impeachment evidence.

Dr. Barnes's and Dr. Ophoven's declarations fall into that latter category. They both opine that Fero probably did not cause Brynn's head injuries. Barnes Decl. at 26-27; Ophoven Decl. at 3, 10. They explain they reached a different conclusion from the State's experts because they chose to rely on recent scientific data rather than past assumptions. Barnes Decl. at 5-6; Ophoven Decl. at 9-10. They do not dispute that the State's experts were correctly testifying to the current state of scientific knowledge at the time of trial. To the extent these opinions have a

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

tendency to undermine the credibility of the State's experts, that tendency is

ancillary.[5]

    D.    *There Are Material Factual Disputes on Almost All of the Points*
        *Addressed Above; Under RAP 16.11 and 16.12 and* Rice, *They Must Be*
        *Resolved at a Reference Hearing in Superior Court*

        1.  Fero Is Entitled to a Reference Hearing on the Credibility of Her
           New Expert Evidence

Fero presents evidence of a paradigm shift in the medical community on

shaken baby syndrome. The State challenges Fero's claim of a paradigm shift.

Wash. Court of Appeals oral argument, *In re Pers. Restraint of Fero*, No. 46310-5-

II (Oct. 26, 2015), at 12 min., 8 sec. through 32 sec. and 16 min., 49 sec. through 17

min., 29 sec. (attached to Resp. to Br. of Amicus Curiae Wash. Assoc. of Criminal

Defense Lawyers). According to the State, "the argument that there's a paradigm

shift is to a large extent a straw man," *id.* at 12 min., 32 sec. through 40 sec., because

---

[5] The Washington Association of Prosecuting Attorneys (WAPA) amicus brief advocates in favor of a new rule classifying all new scientific evidence as "merely impeaching" if it fails to discredit the evidence presented at trial so completely such that the old evidence would still be admissible under *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923). Am. Br. of Amicus Curiae WAPA at 12-13; *State v. Canaday*, 90 Wn.2d 808, 813, 585 P.2d 1185 (1978) (explicitly adopting the *Frye* standard in Washington); *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996) (adhering to the *Frye* standard). That proposed rule is neither advisable nor necessary for us to consider in this case because the new expert evidence here presents a new substantive theory, not an attack on the credibility of the State's experts at the time of trial.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

"there has never been a point in time when defense experts have not contested the validity and tested the science of these cases, so the idea that at some point in the past there was never a dispute and now, only now there has become a dispute is simply incorrect," *id.* at 13 min., 15 sec. through 32 sec. The State also challenged the existence of a paradigm shift on the ground that at least some of the studies on which Fero's experts rely predated her trial. Resp. to Pers. Restraint Pet. at 14.

The State is correct that we do not have to accept Fero's claim of a paradigm shift as true, but we also cannot accept the State's claim that there has not been one either. "[T]he purpose of a reference hearing is to resolve genuine factual disputes." *Rice*, 118 Wn.2d at 886. Thus, once a petitioner has stated with particularity facts that if proved would entitle him or her to relief—which Fero has done—then a reference hearing is necessary to resolve any material dispute regarding the credibility of those factual assertions if they cannot be resolved on the record. *Id.* at 885-86. That's the case here. It is therefore necessary for the superior court to conduct a reference hearing to determine whether Fero's expert evidence is credible.

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> 2. Fero Is Entitled to a Reference Hearing on Whether She Used "Reasonable Diligence" and "Due Diligence" in Discovering the New Evidence and Filing Her Petition

Generally, a personal restraint petitioner seeking a new trial based on newly discovered evidence needs to satisfy only one diligence requirement. That requirement is to show the evidence "could not have been discovered *before trial* by the exercise of due diligence." *Williams*, 96 Wn.2d at 222-23 (emphasis added). But because Fero filed her petition more than a year after her judgment and sentence became final, she must additionally prove that she "acted with reasonable diligence in discovering the [new] evidence and filing the petition." *Stenson*, 174 Wn.2d at 485.

The State argues that Fero did not exercise such diligence because the most recent study that Dr. Barnes cites in his declaration was from 2010—four years before Fero filed her petition. Resp. to Pers. Restraint Pet. at 14-15. While the State correctly identifies the publication date of that study, that date alone does not prove Fero was dilatory in filing her petition, though it is evidence that she might have been. That's because it is unclear when the paradigm shift occurred.

Although Fero's experts insist a paradigm shift has occurred, they are vague about its arrival. They cite "recent medical literature," Ophoven Decl. at 9, and

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

advances "[o]ver the past decade," Barnes Decl. at 5. Whether this shift occurred in 2010 (the date of Fero's most recent study), earlier or never (as the State asserts), or later (as Fero suggests) cannot be resolved on the record. It needs to be addressed at a reference hearing. *Rice*, 118 Wn.2d at 885-86; RAP 16.11(b).

Moreover, even if Fero could have filed her petition earlier, there remains the issue of whether it was "reasonable" for her to wait until the medical science repudiating shaken baby syndrome became more fully developed so she could cast serious doubt on the State's case. Personal restraint petitioners relying on new scientific developments face a legal dilemma: waiting too long risks a violation of the due diligence requirement, yet petitioning too early risks a failure to establish materiality and probable effect. What qualifies as a reasonable waiting period thus can depend largely on the facts of each case.

Lastly, the reasonableness inquiry takes into consideration the circumstances of the petitioner. As Fero highlights, and the Court of Appeals accepted, many barriers could have prevented Fero from marshalling her new evidence earlier, including her incarceration for 10 years and her lack of medical knowledge. *In re Pers. Restraint of Fero*, 192 Wn. App. 138, 161, 367 P.3d 588 (2016), *review granted*, 187 Wn.2d 1024, 390 P.3d 356 (2017).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fero has certainly raised facts that, if believed, show that she discovered and presented her new evidence of a paradigm shift with diligence. The State has certainly challenged her factual assertions of a significant paradigm shift and/or its timing. It is therefore necessary for the superior court to conduct a reference hearing to determine whether she was diligent.

## CONCLUSION

Fero presents evidence of a paradigm shift in the medical community that, if believed, undermines the State's entire shaken baby theory and supports her claim that she is innocent. This evidence, if credible, is material, not merely impeaching, and probably would have affected the result of trial. The State disputes whether a new paradigm shift exists, the date the alleged shift occurred, and the role Fero's incarceration played in impeding her ability to file her personal restraint petition sooner. These questions cannot be resolved based on the record. For that reason, I would reverse and remand to the superior court for a reference hearing pursuant to RAP 16.11(b) and 16.12.

I therefore respectfully dissent.

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Fero (Heidi Charlene)*, No. 92975-1
(Gordon McCloud, J., dissenting)

Geo McCloud, J.

Fairhurst. C.J.